TRW ENVIRONMENTAL SAFETY
SYSTEMS, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Bechtel National, Inc.,
Defendant–Intervenor.

No. 747–88C.

United States Claims Court.

Aug. 24, 1989.

Kenneth B. Weckstein, Washington, D.C., atty. of record, for plaintiff.

John E. Kosloske,[1] Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, for defendant.

Lawrence M. Farrell, Washington, D.C., atty. of record, for defendant-intervenor.

## OPINION

REGINALD W. GIBSON, Judge:

*Introduction*

This pre-award bid protest action comes before the court on plaintiff's motion to permanently enjoin the Department of Energy (DOE) from awarding a contract for the systems engineering, development, and management of the nation's first nuclear waste repository (the SEDM contract). Plaintiff, TRW Environmental Safety Systems, Inc. (TESS), was an unsuccessful bidder on the SEDM contract, which is worth more than one billion dollars over the next 10 years and includes an option to renew for an additional five years. TESS alleges that the Chairman of DOE's Source Evaluation Board (SEB) violated a federal con-

---

1. Mr. Kosloske became government counsel of record on August 3, 1989. Gordon D. Kromberg was counsel of record for the government at all times prior to that date.

flict of interest statute, 42 U.S.C. § 7216, by participating in the SEDM procurement within a prohibitive period while his former employer was then involved in related Department proceedings.

TESS has shown by clear and convincing evidence that the SEDM procurement is tainted by the SEB Chairman's violation of 42 U.S.C. § 7216. Further, this circumstance caused plaintiff's bid to have been treated unfairly. On that basis, we grant plaintiff's motion for a permanent injunction.

*Procedural Posture*

TESS filed a complaint against the government in this court on December 23, 1988, seeking, *inter alia,* bid preparation costs, a temporary restraining order, and preliminary and permanent injunctions, although no accompanying motions therefor were then filed. Therein, TESS alleged that its proposal had been treated unfairly and that DOE's decision to select Bechtel Systems Management Inc. (BSMI), a subsidiary of Bechtel National, Inc. (Bechtel), for negotiations leading to award, was arbitrary and capricious.

On February 13, 1989, plaintiff filed a motion for a preliminary injunction seeking to restrain an award by DOE of the contract for Systems Engineering, Development and Management of the Nuclear Waste Management System for the Office of Civilian Radioactive Waste Management (SEDM) to anyone other than TESS. Shortly thereafter, on February 21, 1989, the court granted Bechtel's motion to intervene in this action as a party defendant on behalf of BSMI. Following thereon, the court held a four-day hearing on TESS's motion for a preliminary injunction from March 3–7, 1989. On March 8, 1989, TESS's motion to preliminarily enjoin DOE from awarding the SEDM contract to anyone other than TESS and from disbursing any funds under said contract was granted. [16 Cl.Ct. 520.] The court's ruling was

premised upon TESS's colorable claim that the Chairman of the SEB, Sam Rousso, violated 42 U.S.C. § 7216. That statute was intended to shield energy related matters from certain conflicts of interest, sometimes euphemistically referred to as the "revolving door." *See* H.R.Rep. No. 539, 95th Cong., 1st Sess. 86, *reprinted in* 1977 U.S.Code Cong. & Ad. News 854, 925, 957.

Following the court's issuance of the preliminary injunction Systems Engineering and Management Company (SEMCO), the second unsuccessful offeror on the SEDM contract, moved on March 16, 1989, to intervene as a party-plaintiff. The court denied SEMCO's motion, citing inexcusable and prejudicial delay. *See TRW Environmental Safety Systems, Inc. v. United States,* 16 Cl.Ct. 516 (1989).

On March 13, 1989, TESS filed a motion for a permanent injunction. The hearing on said motion for a permanent injunction began on March 30 and continued until May 8, 1989, a period of nearly six weeks.[2] All three parties have filed comprehensive post-trial submissions. This opinion addresses those issues raised in a hearing on the merits relative to TESS's motion for a permanent injunction.

*Statement of Facts*

By 1982, there were 77 nuclear power plants in operation in the United States, although a method to *permanently* dispose of high-level radioactive waste and spent fuel, as contemplated under the SEDM, *infra,* had *not* yet been constructed.[3] That same year, *i.e.,* 1982, Congress enacted the Nuclear Waste Policy Act (NWPA), Pub.L. No. 97–425, 42 U.S.C. § 10101 *et seq.* Through the NWPA, Congress created the Office of Civilian Radioactive Waste Management (OCRWM) within DOE and charged it with the task of managing the permanent disposal of spent nuclear fuel and high-level nuclear waste.[4]

---

2. The hearings on the preliminary and permanent injunctions consumed 6,785 transcript pages, included the introduction of 253 exhibits, and the testimony of 19 witnesses.

3. *See Energy Information Administration Monthly Energy Review,* April 1988.

4. Spent nuclear fuel is waste that has been withdrawn from a nuclear reactor following irradiation. 42 U.S.C. § 10101(23). According to

Spent fuel and high-level radioactive waste are extremely hazardous and in order to be disposed of properly and safely must be isolated from the human environment for approximately 10,000 years. To accomplish this objective, OCRWM has contracted for the construction of the nation's first geologic repository in which such waste can be stored deep under ground for the minimum duration of 10,000 years. Under the NWPA, the Secretary of Energy was to select three potentially suitable sites for the repository (42 U.S.C. § 10132(b)(1)(B)), and, through procedures set forth in that Act, collectively termed "site characterization" (42 U.S.C. § 10101(21)), recommend one site to receive the repository upon the issuance of a license by the Nuclear Regulatory Commission (NRC).

However, in 1986, the Director of OCRWM, Mr. Ben Rusche, decided that the project to construct and manage the geologic repository needed a "stronger centralized management" (Tr. I 955).[5] OCRWM noted that a large number of prime contractors were performing work relating to the repository that needed to be coordinated. Therefore, in October 1986, Mr. Rusche instructed Mr. Stephen Kale, the Associate Director in the Office of Geologic Repositories for OCRWM, to undertake a planning exercise to determine what steps and actions should be taken in order to create a Statement of Work (SOW) for the management of the design, construction, and operation of the repository, *i.e.*, the entire project (Tr. 484).

While the SOW was still in draft form, on February 13, 1987, OCRWM published in the *Commerce Business Daily* (CBD) its intention to issue the Request for Proposals (RFP) DE–RP01–88RW00134 for a "Systems Engineering and Development Contractor for [the] First Geologic Repository Program" (previously and hereinafter referred to as the SEDM contract) (PXs 5 and 15). According to this notice, DOE sought a contractor for systems engineering, development, and technical direction for the siting, designing, and licensing requirements of the *first* geologic repository program. Specifically, the notice stated that the successful contractor would be responsible for: (i) integrating the repository system with the overall OCRWM system; (ii) providing technical direction to the characterization program; (iii) providing systems engineering and technical direction for the repository and package system; (iv) developing and proposing licensing strategies and establishing and maintaining an implementation plan to coordinate and direct licensing activities including activities needed to satisfy quality assurance requirements leading to the production of a complete licensing application; and (v) preparing environmental reports.

Later in February 1987, OCRWM decided to further expand the scope of the project by requiring the management and operating (M & O) contractor to oversee the development of the transportation system and the Monitored Retrievable Storage (MRS) Facility, which would serve as a temporary holding place for the waste material prior to being placed in the repository (Tr. I 959–60; 42 U.S.C. § 10161). This change led to a second notice published in the CBD on April 1, 1987, referring to the "Systems Engineering, Development and Management Contractor" (DX 18). Thereafter, OCRWM proceeded to assemble

---

OCRWM, the amount of spent nuclear fuel in this country, which is presently stored in pools at various reactor sites, will exceed 40,000 metric tons by the year 2000, and as many as 45 reactor sites will have exceeded the capacity of their storage pools. High-level radioactive waste, on the other hand, is a product "... resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations." 42 U.S.C. § 10101(12)(A).

5. The following abbreviations are used throughout this opinion:
 Tr. I—Transcript of the hearing on plaintiff's motion for a preliminary injunction;
 Tr.—Transcript of the hearing on plaintiff's motion for permanent injunction;
 PX—Plaintiff's Exhibit;
 DX—Defendant's Exhibit;
 JX—Joint Exhibit.

members to serve on the SEB. These persons were a team of technical experts from various related fields charged with evaluating all proposals submitted on the indicated factors, reporting their findings, and finally recommending to the Source Selection Officer (SSO) a single entity for award.

In this connection, the SEB was officially constituted on May 1, 1987 (DX 3, PX 7). The SEB consisted of the following members:

(1) *Sam Rousso:* Chairman. Mr. Rousso was officially named chairman on May 1, 1987, by Ben Rusche. He began his employment at DOE as Acting Associate Director, Office of Resource Management, OCRWM, beginning in June 1986. He came to DOE directly from Science Applications International Corp. (SAIC), which ultimately became a team member of the winning Bechtel proposal (PX 4, p. 3);

(2) *Gordon Appel:* Physical Scientist, Licensing Branch, Office of Systems Integration and Regulations, OCRWM. Mr. Appel is the branch chief for the licensing branch of OCRWM. He had previously been employed by Dames & Moore, which was also a team member of the winning Bechtel proposal (Tr. 587–90; PX 4, p. 3);

(3) *Mark Frei:* Acting Director, Siting and Facilities Technology Division, Office of Facilities Siting and Development, OCRWM;

(4) *Richard Blaney:* Acting Director, Policy and Program Relations Division, Office of External Relations and Policy, OCRWM;

(5) *Richard Leotta:* Contract Specialist, Office of Procurement Operations, MA;

(6) *James Blaylock:* General Engineer, Nevada Operations Office; and

(7) *William Lemeshewsky:* General Engineer, Integration Branch, Office of Systems Integration and Regulations, OCRWM.

(DX 3, p. 17).

The legal advisor to the SEB was Cris Smith, Attorney, Office of General Counsel; and the Executive Secretary was Craig Ashline, Contract Specialist, Office of Procurement Operations, MA, both of whom were non-voting members (DX 3, pp. 17 and 18). The *ex officio* SEB members were:

(1) *Charles E. Kay:* Acting Director, Office of Civilian Radioactive Waste Management;

(2) *David Newman:* Director, Office of Procurement Operations, MA;

(3) *Nick Acquilina:* Manager, Nevada Operations Office;

(4) *Ralph Stein:* Acting Associate Director, Office of Systems Integration and Regulations, OCRWM;

(5) *Thomas Isaacs:* Acting Associate Director, Office of External Relations and Policy, OCRWM;

(6) *Stephen Kale:* Acting Associate Director, Office of Facilities Siting and Development, OCRWM.

(DX 3, p. 18).

On June 3, 1987, approximately one month after the SEB was formally constituted, a draft SOW for the SEDM procurement was disseminated to all potential offerors who responded to the CBD notice. An information letter attached to said draft SOW advised that DOE wished to "attract industry's highest level of technical and managerial expertise through competition to satisfy this critical requirement" (PX 8). Said letter also informed all parties that subject requirement "will result in a cost-plus-award-fee Management and Operating contract," and that a pre-solicitation conference would be held on June 16, 1987, for all potential offerors (PX 8). At said conference, DOE discussed the draft SOW, announced the opening of reading rooms, and discussed Organizational Conflict of Interest (OCI) guidelines (DX 3 at 13).

Following thereon, the SEB issued RFP No. DE–RP01–88RW00134 (RFP) for the SEDM contract on October 5, 1987, with a closing date of January 15, 1988. However, said RFP was amended on February 25, 1988, to reflect certain changes in the SEDM program stemming from the enactment on December 22, 1987, of the Nuclear Waste Policy Amendments Act of 1987 (PX 15, p. 1). In short, the amended RFP called for Yucca Mountain, Nevada, to be con-

sidered as the only repository site, rather than one of a total of three sites, as proposed in the initial RFP (PX 15). The amended RFP also provided for a performance period of 10 years with a five-year option to renew in DOE, a cost reimbursement contract, and an operating budget of $1 billion for the first 10 years. Equally significant, the RFP set forth the following evaluation criteria against which each submitted proposal would be rated (PX 15, pp. 183–86):

*General Management Evaluation Criteria*

1. Key Personnel
 a. key lead managers
 b. key managers
 c. selected lower-level managerial and non-managerial personnel
2. Corporate Capability
 a. corporate experience
 b. corporate commitment

*Business Management Evaluation Criteria*

1. Project Management Approach
2. Transition Plan
3. Organization

*Technical Evaluation Criteria*

1. Technical Approach
 a. repository
 b. waste system design, monitored retrievable storage (MRS), and transportation
 c. technical control system

*Financial Considerations.*

As stated in the RFP, the proposals of each contractor would be rated adjectivally, *e.g.*, outstanding, good, satisfactory, poor, or unsatisfactory. Brief definitions of each adjectival rating were also provided (DX 8).

The deadline established for the submission of proposals was April 25, 1988.

Of the 360 firms that requested copies of the RFP,[6] only three submitted proposals: Bechtel National, Inc., TRW Environmental Safety Systems, Inc., and Systems Engineering and Management Company. Bechtel's proposal advised that a subsidiary, Bechtel Systems Management, Inc., would be created upon DOE's selection of the Bechtel proposal for award of the SEDM contract. TESS, similarly, is also a subsidiary created solely to carry out the SEDM contract requirements, but had already been incorporated prior to the submission of proposals.[7]

On July 13, 1988, DOE informed each of the offerors that all three proposals were determined to be within the competitive range. However, after considering each proposal, the SEB then identified what it perceived to be weaknesses in each proposal, prepared a list of questions addressing these weaknesses, and submitted them to the respective offerors. Each offeror was allowed to explain the perceived weaknesses or alter its proposal. The offerors responded to these questions on or about August 29, 1988. DOE subsequently held discussions with the offerors in Washington, D.C., between September 14–16, 1988, at which time each offeror formally presented its proposal.

On September 20, 1988, DOE notified each offeror by letter that discussions were closed and requested revised offers. Thereafter, on October 4, 1988, the offerors submitted their best and final offers. DOE then requested additional information from each offeror regarding OCIs. Still more requests were made, on or about November 21, 1988, by DOE regarding each

---

6. DOE maintained a list of the names of firms requesting the RFP. Mr. Rousso's former employer's name appeared on that list (PX 6).

7. The Bechtel team consists of the following subcontractors:
 (1) Westinghouse Electric (Westinghouse)
 (2) Battelle Memorial Institute
 (3) Science Applications International Corp. (SAIC)
 (4) Parsons, Brinkerhoff, Quade and Douglas
 (5) Dames & Moore

(6) Shannon & Wilson
(7) Los Alamos Technical Associates.
The TESS team is composed of the following subcontractors:
 (1) Fluor–Daniel
 (2) Morrison–Knudsen Engineering
 (3) Duke Engineering and Services
 (4) Babcock & Wilcox
 (5) Woodward Clyde Consultants
 (6) Intera Technology
 (7) R & D Associates.

offeror's team contractual features and fees, whereupon each offeror responded satisfactorily.

The SEB, on December 2, 1988, made its presentation to Dr. Lawrence Davenport, DOE Assistant Secretary, Management and Administration, who had been appointed SSO in November 1987 when Mr. Rusche left government service (DX 3, p. 9). Mr. Rousso, as SEB Chairman, made the Board's presentation to Dr. Davenport, recommending that Bechtel's proposal be selected for negotiations leading to award. After further consideration with the *ex officio* members of the SEB, Dr. Davenport, on December 9, 1988, signed a source selection statement formally selecting Bechtel for negotiations leading to award. TESS followed the foregoing selection with the filing of a petition in this court for injunctive relief on December 23, 1988.

### The Parties' General Contentions

The defendants strenuously aver that the selection of Bechtel was rational. This is so, they maintain, because the necessary single rational basis existed in *all* of the following DOE actions—the manner of selection of each member of the SEB; the manner/method of evaluation of each offeror's strengths and weaknesses; the voting procedures by members of the SEB regarding the evaluation factors; the method of evaluating OCIs; and judging the relative importance of estimated costs. With regard to the treatment of TESS's proposal by the SEB and the SSO, the defendants contend that the selection process was not a matter of finding fault with TESS's proposal, but rather it was simply a matter of selecting the best of three proposals. That is to say, according to the defendants, in order to prevail plaintiff must do more than merely show that its proposal was adequate.

Turning to TESS's detailed contentions regarding the alleged erroneous application of the RFP ratings to the evaluation factors, *i.e.,* (i) evaluating key lead managers by their experience in nuclear waste, nuclear industry, nuclear licensing, systems engineering, and geoscience; (ii) the evaluation of the offeror's relevant corporate experience; (iii) corporate commitment; (iv) the advantage of co-location; and (v) the teaming experience of the Bechtel team as superior to that of the TESS team, defendants argue that such ratings were rational.

TESS next raises the point that there were statutory violations by certain SEB members that constitute unfair treatment of its bid. In response to Mr. Rousso's alleged violation of 42 U.S.C. § 7216, the defendants posture that plaintiff has failed to establish five elements: (i) that SAIC was an energy concern; (ii) that the SEDM contract was a "Department proceeding," as contemplated by § 7216; (iii) that SAIC's involvement in any such proceeding was "material, direct, or substantial"; (iv) that Mr. Rousso knew of any such involvement on the part of SAIC; and (v) that TESS was prejudiced by any such conduct.

In response to TESS's allegation that Stephen Kale (an *ex officio* member of the SEB) violated 18 U.S.C. § 208 because of his vested pension with Westinghouse, the defendants argue that (i) Mr. Kale had no financial interest in the SEDM procurement; (ii) Mr. Kale did not participate personally and substantially in the evaluation of TESS's proposal and had no financial interest in the selection of BSMI; and (iii) TESS was not prejudiced by any such alleged conduct.

Arguing that Gordon Appel (a voting member of the SEB) did not violate any conflict-of-interest laws or regulations, the defendants contend that—Mr. Appel's previous employment with Dames & Moore (also a member of Bechtel's team) does not preclude him from evaluating the offerors' proposals; that the fact that he had listed his former superior at Dames & Moore as a job reference does not preclude him from participating in the evaluation and selection process; and that TESS was not prejudiced by such circumstances.

Next, the defendants maintain that DOE's evaluation was conducted neither fraudulently nor in bad faith. DOE, the defendants argue, need not award a contract to any offeror that meets the *minimum* requirements of the RFP. Rather,

DOE must award the contract to the offeror submitting the proposal that most greatly exceeds the requirements of the RFP. Moreover, in the defendants' answers to plaintiff's allegations that the SEB failed to consider OCIs and Foreign Ownership, Control or Influences (FOCIs), they explain that all OCIs presented by the Bechtel proposal were resolved satisfactorily to the SEB and the SSO, and that all procedural requirements regarding the satisfaction of FOCIs were met by Bechtel.

Lastly, the defendants also support the selection of Dr. Davenport, the SSO, as rational. Defendants further contend that Dr. Davenport satisfactorily performed each and every duty required of him under applicable statutes and regulations.

*Issues*

Plaintiff filed its Statement of Issues, which was later buttressed by a Supplement to Statement of Issues filed on May 30, 1989. Therein, plaintiff advanced a plethora of primary issues that have opened the proverbial Pandora's box of sub-issues addressing practically every conceivable point imaginable on both the facts and law. In fact, 24 primary issues and 54 sub-issues were raised—a total of 78 issues. The foregoing 78 issues may be restated under two broad categories as follows:

Should this court permanently enjoin DOE from awarding the SEDM contract to anyone other than plaintiff—

(i) because DOE (Mr. Rousso *et al.*) violated statutes and/or applicable regulations causing TESS's bid to be treated unfairly; and

(ii) because DOE acted arbitrarily and capriciously in the treatment and evaluation of TESS's bid, thus failing to act fairly, reasonably, and rationally?

The court will *not* separately and specifically address each issue, for we hold that a definitive resolution of this case turns on whether there was a violation of 42 U.S.C. § 7216. Moreover, a narrative of each issue and contention, seriatim, in the body of this opinion would thoroughly confuse and undoubtedly exhaust the reader. However, in disposing of this matter, we will generally comment on the probative effect of the overall evidence regarding *all* such issues in the context of applicable law.

*Discussion*

I. *Legislative History of 28 U.S.C. § 1491(a)(3)*

■ Prior to the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, Title I, § 133(a), 96 Stat. 25, 39, codified at 28 U.S.C. § 1491 (West Supp.1989), the predecessor Court of Claims possessed no equitable jurisdiction. That Act empowered the newly-created United States Claims Court with the power to grant certain limited equitable (injunctive) relief in so-called "bid protest" cases. *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1369 (Fed.Cir.1983), and *International Graphics Co. v. United States*, 4 Cl.Ct. 186, 192 (1983). The basic underlying theory for relief in a bid protest case is that an implied-in-fact contract arises when the offeror submits its bid/offer in response to the agency's invitation for bids. *Id.* A breach of said contract occurs thereafter when, upon proof, it is established that the bid/offer was not treated fairly. We initiate our discussion by observing that the court's new jurisdiction over pre-award bid protest cases stems from § 1491(a)(3), Title 28 U.S.C., which provides as follows:

> To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief. In exercising this jurisdiction, the court shall give due regard to the interests of national defense and national security.

■ In applying the provisions of § 1491(a)(3) over the last six and one-half years, a multitude of definitive rulings have emerged through court decisions which guide the disposition of issues arising thereunder. Pertinent to the foregoing are the following: Injunctive relief is extremely drastic; the court must exercise great caution and should not substitute its judgment for that of the agency; judicial intrusion into the procurement pre-award

agency decision is generally limited in scope, circumspect, and infrequent; and the court should intervene only when it is clearly determined and proven that the agency's determination is irrational or unreasonable or where the decision was made in clear and prejudicial violation of applicable statutes or regulations. *DeMat Air, Inc. v. United States*, 2 Cl.Ct. 197, 201–02 (1983). Additionally, it has been held that a failure to treat one's bid fairly and honestly can be shown by a mere violation of a statute/regulation. *Sterlingwear of Boston, Inc. v. United States*, 11 Cl.Ct. 517, 522 (1987) (citing *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1574 (Fed. Cir.1983)).

■ However, the government must, generally, be permitted to exercise its right to conduct business with those contractors it selects and to do so in an expeditious manner. This is, perhaps, particularly true where an agency's decisions are highly technical in nature. In this circumstance judicial restraint is all the more appropriate and proper. *Electro–Methods, Inc. v. United States*, 7 Cl.Ct. 755, 763 (1985) (citing S.Rep. No. 275, 97th Cong., 1st Sess. 23, *reprinted in* 1982 U.S.Code Cong. & Ad. News 11, 33); and *Isometrics, Inc. v. United States*, 5 Cl.Ct. 420, 423 (1984) (quoting *FPC v. Florida Power & Light Co.*, 404 U.S. 453, 464, 92 S.Ct. 637, 644, 30 L.Ed.2d 600 (1972)).

■ To prevail in this court under § 1491(a)(3), it is axiomatic, therefore, that a heavy burden is on the aggrieved bidder to establish *by clear and convincing evidence* that the agency's determination was unreasonable or irrational. *DeMat Air*, 2 Cl.Ct. at 202. As a general proposition, while a contracting officer may exercise wide discretion in his evaluation of bids and in the application of procurement regulations, particularly in negotiated procurements, the ultimate obligation of the agency is to treat all bidders fairly and give full consideration to all bids. *Id.* (quoting *Keco Industries, Inc. v. Laird*, 318 F.Supp. 1361, 1364 (D.D.C.1970)); *Heli–Jet v. United States*, 2 Cl.Ct. 613, 618 (1983) (quoting *Ingersoll–Rand Co. v. United States*, 2

Cl.Ct. 373, 376 (1983)). Concomitantly, the Claims Court should exercise its equitable authority only if award would be the result of arbitrary and capricious action by the contracting officer to deny a qualified firm the opportunity to compete fairly. *Electro–Methods*, 7 Cl.Ct. at 763. Moreover, *absent overriding public interest*, the Claims Court should refuse to look favorably on a petition for injunctive relief in bid protest cases. *DeMat Air*, 2 Cl.Ct. at 202.

■ On the other hand, to prevail in such action it is not incumbent on the offeror to show that it would have received the award "but for" the unreasonable or irrational conduct or the violation of a statute. It is sufficient if the bidder simply shows, by the requisite quantum together with the other minimally required evidence, that it was within the zone of competitive range or "active consideration" and that if its bid had been fairly and honestly treated, there was a substantial chance it would have received the award. *Morgan Business Associates v. United States*, 223 Ct.Cl. 325, 331, 619 F.2d 892, 895 (1980); *CACI, Inc.– Federal*, 719 F.2d at 1574.

It is patently clear that the burden which Congress intended to place on the bidder is egregious and onerous. Illustrative of the foregoing is the Senate Committee Report which states, in pertinent part, as follows:

> The courts ordinarily refrain from interference with the procurement process by declining to enjoin the government from awarding a contract to a contractor which the government has selected.

S.Rep. No. 275, 97th Cong., 1st Sess. 23 (1981), U.S.Code Cong. & Admin.News 1982, pp. 11, 33. Furthermore, the House Committee expressed its intent that "the court ... take care and not delay or prevent the award of contracts for goods and services which relate to defense or security," and that the Committee "expects that the court will utilize its injunctive power in truly extraordinary circumstances." *Id.* Therefore, against this background, it is well settled that Congress did not intend this court to react and consider every alleged irregularity, but only those irregularities denying a bidder a fair opportunity to

compete. *See Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 573, 492 F.2d 1200, 1203 (1974).

■ In *Keco*, the Court of Claims held that proven violations of pertinent statutes or regulations can, but need not necessarily, be a ground for recovery for a disappointed bidder. *Id.* at 574, 492 F.2d at 1204. The significance of and effect given to such a violation on the part of the government depends upon the impact or purpose of the statute. Thus, our analysis must be in two-parts: (i) whether the evidence clearly and convincingly establishes that a particular statute was violated; and (ii) whether such violation is one that merits injunctive relief.

The plaintiff herein asserts that DOE committed numerous violations of both statutes and regulations alike. We, therefore, must initially focus on the first of our two-part analysis, whether a statute was in fact violated. More specifically, whether Mr. Sam Rousso's involvement in the SEDM procurement while employed by DOE within one year of terminating his employment with SAIC, constitutes a violation of § 606 of the Department of Energy Organization Act, Pub.L. No. 95–91, Title VI, § 606, 91 Stat. 565, 595 (1977), codified at 42 U.S.C. § 7216 (1988).

## II. *Violation of Conflict of Interest Statute as Grounds for Relief*

### A. *Section 7216*

Plaintiff's major grievance is that Mr. Samuel Rousso, Chairman of the Source Evaluation Board (and previously Chairman of the Preliminary Planning Session) (Tr. I 78–80), violated § 7216 of Title 42 U.S.C. by serving in these and other positions at DOE within the one-year restricted period. Section 7216, in relevant part, provides as follows:

> For a period of one year after terminating any employment with any energy concern, no supervisory employee shall knowingly participate in any Department proceeding in which his former employer is substantially, directly, or materially involved....

We begin our analysis by noting, seriatim, each of the six elements in the statute and discussing the operative facts and reasonable inferences drawn therefrom.

### 1. *The One–Year Period*

■ Mr. Rousso was employed by SAIC from October 1985 to May 30, 1986. He left SAIC in order to accept a "SES vacancy" with DOE. Said employment with DOE commenced on June 2, 1986, and continues to this date. The resignation was effected by Mr. Rousso upon his submission of a letter dated May 11, 1986, to his then supervisor, Dr. Peter McGrath.

The foregoing facts are not in dispute, and have been duly corroborated by direct testimony and documentary evidence. These uncontroverted facts firmly establish the restricted one-year period to run from May 31, 1986 through May 29, 1987, as the time frame during which § 7216 applied to Mr. Rousso. Each of the remaining five indispensable elements of § 7216, we find, must have been met *within this one-year window.*

### 2. *Was SAIC An Energy Concern?*

■ The second element required to be established is that SAIC must have been an energy concern within that one-year period. The phrase "energy concern" is statutorily defined at § 7211(b), Title 42 U.S.C.,[8] as

---

**8.** 42 U.S.C. § 7211(b), entitled "Energy concern," provides as follows:

> For purposes of this subchapter the term "energy concern" includes—
> (1) any person significantly engaged in the business of developing, extracting, producing, refining, transporting by pipeline, converting into synthetic fuel, distributing, or selling minerals for use as an energy source, or in the generation or transmission of energy from such minerals or from wastes or renewable resources;
> (2) any person holding an interest in property from which coal, natural gas, crude oil, nuclear material or a renewable resource is commercially produced or obtained;
> (3) any person significantly engaged in the business of producing, generating, transmitting, distributing, or selling electric power;
> (4) any person significantly engaged in development, production, processing, sale, or distribution of nuclear materials, facilities, or technology;
> (5) any person—

well as under the DOE regulations at 10 C.F.R. § 1010.103(k). Generally, the term contemplates "any person significantly engaged in" a variety of energy related business activities. The regulations substantially track the language of the statute.

At the time Mr. Rousso left SAIC at the end of May 1986, SAIC was heavily involved with work relating to the repository at the Yucca Mountain, Nevada site. It had previously executed two contracts directly with OCRWM for technical and management support services relating to the repository at Yucca Mountain, first in 1983 (DE–AC08–83NV10576) and again in February 1987 (DOE8–87NV10576). As evidenced by the testimony of Dr. Peter McGrath, SAIC's Group Manager for Energy Systems, SAIC's energy group alone held no less than 50 contracts with DOE at this time. Moreover, as established by Joint Exhibit 2, SAIC had, between 1983 and December 31, 1988, entered into, performed, or was then performing work under 202 contracts with DOE. Furthermore, in response to a questionnaire submitted to SAIC by DOE on April 11, 1988, SAIC responded in the affirmative to the question—"Are you ... an energy concern?" (PX 27). This responsive document was signed by SAIC's corporate vice-president. We view this evidence to be circumstantially corroborative.

Perhaps the most enlightening evidence with respect to the issue—whether SAIC was an "energy concern" within the operative period, however, is the fact that Ms. Susan Fonner, the Deputy Assistant General Counsel for General Law at DOE, wrote a letter to Mr. Rousso dated May 28, 1986 (PX 42)—two days before he terminated his employment with SAIC—which stated:

*Science Applications has been determined to be an energy concern.... Accordingly, when you assume your position with the Department, the provisions of section 606(a) and (b) [section 7216(a)*

(A) significantly engaged in the business of conducting research, development, or demonstration related to an activity described in paragraph (1), (2), (3), or (4); or

(B) significantly engaged in conducting such research, development, or demonstration

and (b) ] *will be applicable to you with respect to your prior employment with that company....*

*... You have also informed me that you will not be asked to participate in matters relating to [SAIC] during the first year of your DOE employment....*

(emphasis added).

DOE failed, however, to maintain a *list* of persons determined by the Secretary to be "energy concerns," as required by § 7211(c) of Title 42 U.S.C. Therefore, this May 1986 finding of the Deputy Assistant General Counsel was the *only* existing determination by DOE as to whether SAIC was an "energy concern" during the one-year period (May 31, 1986 through May 29, 1987) following Mr. Rousso's departure from SAIC.

During his direct testimony, and also corroborative of the foregoing, Mr. Rousso testified as follows:

Q. Does Plaintiff's Exhibit 42 indicate that SAIC has been determined by the Department of Energy to be an energy concern?

A. Yes it does.

Q. And that was communicated to you?

A. By this letter, yes.

(Tr. 47). On cross-examination, Ms. Fonner admitted that—"I determined that it was an energy concern based on that information" (Tr. 1879). No document was introduced into evidence, prepared within the one-year restricted period of § 7216, which revoked Plaintiff's Exhibit 42 that previously declared SAIC to be an energy concern. Mr. Ralph Goldenberg, Assistant General Counsel for General Law, testified relevant to the foregoing, as follows:

Q. Is there any document in the world that's been issued by the Department of Energy that indicates that SAIC was not an energy concern as of May 30, 1986?

with financial assistance under any Act the functions of which are vested in or delegated or transferred to the Secretary or the Department.

A. No, sir.

Q. Defendant's Exhibit 37 [a DOE opinion memorandum dated February 12, 1988] doesn't indicate that. Correct?

A. That's correct.

Q. Defendant's Exhibit 129 [a DOE memorandum dated March 29, 1989] doesn't indicate that.

A. That's correct.

(Tr. 4948).

The government disputes the efficacy of the May 1986 opinion letter of Ms. Fonner to Mr. Rousso, as well as her conclusion that SAIC is an energy concern. In support of its position, the government relies upon two documents, both of which were signed by Mr. Goldenberg, Assistant General Counsel for General Law. One is dated February 12, 1988, and the second is dated March 29, 1989—the day prior to the start of the hearing on this motion for a permanent injunction.

The February 1988 memorandum was written for the purpose of advising a DOE employee (not Mr. Rousso) as to whether it was necessary for him to divest himself of his *stock* interest in SAIC. The pertinent question there, in 1988, as here from May 1986 to May 1987, was also—whether SAIC was an energy concern. Because DOE determined, on February 12, 1988, that SAIC was *not* an energy concern "for purposes of the divestiture provision" (DX 37, p. 4), it consequently advised the individual employee that it was *not* necessary for him to divest himself of SAIC's stock. In arriving at this conclusion, DOE claims to have considered the ratio of SAIC's energy related gross receipts to its total gross revenue, and concluded that because its energy related gross revenues were less than 10% (*i.e.,* 8%) of gross revenues from all sources, SAIC was *not* an energy concern.

In utilizing this formula, DOE seized upon the language in § 7211(b), which defines an "energy concern" as any person "significantly engaged" in the indicated statutory activities. The extent of this engagement—whether it was significant— was therefore premised on the ratio of energy related receipts to total gross receipts within the then ended fiscal year.

Thus, it can be seen that DOE determined that—where energy related activities generated receipts totalling less than 10% of total gross receipts, the entity was *not* "significantly engaged" in energy related activities. Therefore, such entity was not an energy concern within the meaning of the statute. Such a determination would have, of course, required calculations of energy and total gross receipts for the fiscal year from SAIC's records, as well as a computation of the ratio of the former to the latter. Strangely, and for some unknown reason which is not explained on the record, the government failed to proffer any such work paper to corroborate Ms. Fonner's testimony, and also failed to explain the reason for not having done so.

The defendants argue that because this determination was based upon SAIC's financial records for the fiscal year January 2, 1986 through January 3, 1987, it is conclusive evidence that, upon such an in-depth analysis, SAIC was not an energy concern when Mr. Rousso began employment at DOE in June 1986, and that Ms. Fonner's earlier determination was, therefore, in error (Tr. 4940–42; DX 37). The court has substantial misgivings as to the propriety of giving the same credence to this February 1988 memorandum opinion of Ms. Fonner as do the defendants. Focusing on the definition of "energy concern," as amplified by the regulations at 10 C.F.R. § 1010.103(k), the court notes that the initial definition is—"[a]ny person listed on the Energy Concern List published by DOE." While DOE, as stated, *supra,* failed to maintain such a list, the court interprets this first definition to mean, in effect, that an "energy concern" is any entity *so designated by DOE.* Clearly, Ms. Fonner's memorandum opinion to Mr. Rousso of May 28, 1986, is an efficacious documentation of DOE's determination that SAIC *was* an energy concern as of May 28, 1986, and continued to be so through at least February 11, 1988. This the court finds based on the record.

Defendants take the position that the memorandum opinion of February 12, 1988 (DX 37, p. 4), in which Mr. Goldenberg

concluded that "SAIC is *not* an energy concern for purposes of the divestiture provision of the DOE Organization Act" (emphasis added), retroactively repeals, *sub silentio,* Ms. Fonner's memorandum opinion (May 28, 1986) that SAIC *was* an energy concern (PX 42). The court is neither impressed with nor persuaded by this specious argument, particularly where, as here, no such intendment is manifested anywhere in Defendant's Exhibit 37. In fact, the court finds it to be incredulous. This conclusion is warranted because a close reading of Defendant's Exhibit 37 discloses that in *February 1988,* at the time it was written, neither the drafter(s) nor the signator had any thoughts regarding the impact of Defendant's Exhibit 37 on Plaintiff's Exhibit 42. This is crystal clear in view of the fact that it is stated at page 2 of Defendant's Exhibit 37 that—"This office has not previously been called upon to determine whether a research consulting firm such as SAIC is an 'energy concern'...." If in February 1988, when DOE determined that SAIC was *not* an energy concern "for purposes of the divestiture provisions," it had completely *forgotten* its previous ruling of May 28, 1986 (PX 42), that SAIC *was* an energy concern, it could not have then contemplated a retroactive effect of said (DX 37) determination on Plaintiff's Exhibit 42 which concluded that SAIC was an energy concern. Against this background, therefore, it certainly strains credulity to contend otherwise.

The defendants next put forth an inter-office memorandum dated March 29, 1989 (DX 129), *post litem motam,* from Ralph Goldenberg, the Assistant General Counsel for General Law, purportedly advising DOE's Acting General Counsel, Erik J. Fygi, that in his opinion Mr. Rousso's participation in the SEDM procurement was not a violation of § 7216. After explaining in the body of said memorandum that Susan Fonner had previously determined that SAIC *was* an energy concern (May 28, 1986) and that the restrictions of § 7216 applied to Mr. Rousso prior to May 30, 1987, Mr. Goldenberg concludes from the foregoing that, "as a DOE employee, Mr. Rousso was prohibited until May 30, 1987,

from participating in any Department proceeding in which SAIC was substantially, directly, or materially involved...." (DX 129). In footnote 4 to that statement, however, Mr. Goldenberg explains that in February 1988, in an unrelated matter to the SEDM procurement, his office determined that SAIC was *not* an energy concern—a reference to the February 1988 letter discussed *supra.* It is the footnote which the defendants embrace in support of their position that SAIC is *not* an energy concern. They seemingly ignore the contradictory body of the letter, offering no explanation as to why one position was stated in the body of the letter and the opposing view relegated to the footnote.

In any event, this inter-office memorandum was written one day *prior* to the start of the hearing on plaintiff's motion for a permanent injunction, and weeks subsequent to this court's grant of a preliminary injunction against DOE. It is indeed difficult to imagine a more explicit example of the preparation of a hospitable document in furtherance of a litigious position. We find such evidence to be totally *self-serving and unreliable* for the purpose proffered. Accordingly, this court does not find Defendant's Exhibit 129 to be probative for the position that SAIC was *not* an energy concern from May 28, 1986 to May 30, 1987. To the contrary, the evidence is clear and convincing that SAIC, at the time Mr. Rousso began his employment at DOE, and at least through May 31, 1987, was an "energy concern" as contemplated in 42 U.S.C. § 7216.

### 3. *Supervisory Employee*

Neither party-defendant to this lawsuit contends that Mr. Rousso was *not* a "supervisory employee" as that term is used in § 7216. In § 7211(a) of Title 42 U.S.C., the term "supervisory employee" is defined as:

(1) an individual holding a position in the Department at GS–16, GS–17, or GS–18 of the General Schedule or at level I, II, III, IV, or V of the Executive Schedule, or who is in a position at a comparable or higher level on any other Federal pay scale, or who holds a position pursu-

ant to subsection (b) or (d) of section 7231 of this title, or who is an expert or consultant employed pursuant to section 3109 of Title 5 for more than ninety days in any calendar year and receives compensation at an annual rate equal to or in excess of the minimum rate prescribed for individuals at GS–16 of the General Schedule;

(2) the Director or Deputy Director of any State, regional, district, local, or other field office maintained pursuant to section 7260 of this title;

(3) an employee or officer who has primary responsibility for the award, review, modification, or termination of any grant, contract, award, or fund transfer within the authority of the Secretary; and

(4) any other employee or officer who, in the judgment of the Secretary, exercises sufficient decisionmaking or regulatory authority so that the provisions of this subchapter should apply to such individual.

Both Ms. Fonner's letter to Mr. Rousso of May 28, 1986, and Mr. Goldenberg's letter to Mr. Fygi in March 29, 1989, unequivocally concede that Rousso is a supervisory employee for purposes of § 7216. This is especially significant given the power of the Secretary or his delegates to determine as a matter of law that a particular employee is a "supervisory employee," as provided in § 7211(a)(4). These two letters constitute such a determination.

Furthermore, within the one-year window of time subsequent to Mr. Rousso's departure from SAIC, he, according to his own testimony, was acting as the unofficial SEB chairman (Tr. I 79). Also at this time, he supervised approximately 50 employees (Tr. I 101). Moreover, he was formally appointed on May 1, 1987, as the Chairman of the SEB. Finally, in his direct testimony Mr. Rousso admitted that he was appointed to a SES Level IV upon his employment on June 2, 1986 (Tr. 47). Clearly then, these indisputable facts conclusively establish Mr. Rousso as a supervisory employee under § 7211(a)(1) and (3).

The court finds, therefore, that Mr. Rousso was a supervisory employee as defined under § 7216 while employed by OCRWM in his first year subsequent to leaving SAIC.

### 4. Department Proceeding

We next turn to the fourth element, which raises the question—whether Samuel Rousso, within one year subsequent to terminating his employment with SAIC, participated in any "Department proceeding" at DOE as contemplated under § 7216. The court finds that he in fact did so.

■■■ No definition of "Department proceeding," as used in § 7216, appears within the statute. The attending circumstances underlying the purpose of § 7216, as perceived by Congress, *infra*, strongly support the position that the term "proceeding" was not intended to be strictly construed. Consistent with this finding is the fact that the DOE Acquisition Regulations define that phrase accordingly:

(h) "Department proceeding" means, for the purposes of section 606 of Pub.L. 95–91 (42 U.S.C. 7216), *any* judicial proceeding, Department hearing, application, rulemaking, order, license, contract, grant, award, fund transfer, claim, controversy, charge, accusation, or arrest, in which the Department is directly involved.

10 C.F.R. § 1010.103(h) (1988) (emphasis added).

It can be seen, therefore, that even the definition in DOE's interpretive regulations of "Department proceeding" is extremely broad and appears to embrace the entire contemplated work scope of DOE in effecting procurements such as the SEDM. The manner in which the word "any" is included in this definition, wherein it *precedes*, modifies, and expands *every* word in the definition, clearly serves to broaden the meaning of each. In this context, therefore, we construe the word "any" to mean "without limitation as to which," that is to say, "every." *The Oxford English Dictionary*, 538 (2d ed. 1989). Given the foregoing, we find that there are two particular terms contained in DOE's definitional regulations that apply to the activities in which

Mr. Rousso participated within the one-year restricted period, *i.e.*, "any ... contract" and "any ... controversy." The court will next discuss each, seriatim.

### a. Any Contract

█ Counsel for the government strenuously argues, in effect, that because no *de jure* contract existed between Bechtel and/or SAIC with DOE prior to June 1, 1987, a finding that a "Department proceeding" took place cannot be based on the phrase "any contract." This contention is an unwarranted strict interpretation of the words "any contract," given the context used and the purpose of the statute. As the government would have it, to participate in "any contract" to the extent it would constitute a "Department proceeding" as envisioned by § 7216, would only occur *upon* and *after* the execution of a contract, rather than with respect to partaking in bona fide activities calculated to lead to such execution. We feel that such a strict definition of the phrase "any contract" would, in effect, defeat Congress's objective regarding § 7216, and would fail to give deference to the context in which it is used in the statute. That purpose is to prevent conflicts of interest in such matters as are in issue here at bar. Absent such an interpretation, it would necessarily permit a government official to interface to almost any extent with respect to his former employer within the one-year restricted period as long as his involvement ceased just immediately prior to the actual execution of the implied-in-fact contract. Such an interpretation would be tantamount to locking the barn door after the horses have been stolen. Certainly Congress was far more intuitive in its legislative purpose in promulgating § 7216. It is clear to this court that the phrase "any contract," as it is used here to define the term "Department proceeding," also means related activity leading to the execution of a contract.

Mr. Rousso's involvement with the SEDM procurement admittedly began almost as soon as he arrived at DOE in June of 1986. This finding is warranted since, at the hearing on plaintiff's motion for a preliminary injunction, he responded to the question—"What work did you do [in the summer of 1986] regarding the SEDM procurement?"—as follows:

A. There was a general retreat session of the major senior officials in the program at which one of the subjects was *how to better get our arms around this program* and the thought emerged of trying to get a major contractor to subsume the some 109 contracts we had existing with primes and major subs at the three sites at three different states where this program was being conducted. And it was the early thought process.

Q. Were you party to those discussions?

A. Yes I was.

(Tr. I 64) (emphasis added). Mr. Rousso went on to say that he "participated in some summary sessions" (Tr. I 65) with an OCRWM task group charged with "look[ing] at how to scope out the needs for such an eventual RFP" (Tr. I 64), and how they ought to proceed. As a member of the OCRWM senior management staff, he admitted that he was involved at that stage (Tr. I 65). At these meetings, which continued into December 1986, the attendees discussed what needed to be contained in the SOW.

The record shows that from January 1987 through March 1987, Mr. Rousso spent approximately 25% to 33% of his time on the SEDM procurement, primarily reviewing drafts of the SOW (Tr. I 70). Also during this period, Mr. Rousso was acting as the unofficial chairman of the SEB (Tr. I 79). Additionally, he chaired preliminary planning sessions with respect to the SEDM procurement. In his own words, he was a "major participant" in drafting the SOW (Tr. I 79).

On May 1, 1987, Mr. Rousso was officially named Chairman of the SEB for the SEDM procurement. The SEB, in this period and thereafter, rewrote and expanded the SOW so that it could be used as a basis upon which to "build a complete RFP" (Tr. I 79). By May 1987, and within the one-year restricted period after leaving SAIC,

Mr. Rousso was devoting up to 50% of his time to the SEDM procurement (Tr. I 80).

The court finds noteworthy, and corroborative of the foregoing, the fact that DOE's Designated Agency Ethics Official, Ralph Goldenberg, also the Assistant General Counsel, by an opinion letter dated March 29, 1989, to DOE's Acting General Counsel (discussed *supra*), concurs with the court's foregoing characterization of Mr. Rousso's activities as "Department proceedings." He states as follows: [9]

> In order to determine whether Mr. Rousso's *activities* violated section 606, it is first necessary to identify the "Department proceeding" involved. Neither the statute nor its legislative history contains a definition of "Department proceeding" for purposes of section 606. However, DOE's Conduct of Employees Regulation (10 C.F.R. Part 1010) specifically defines "Department proceeding" in the context of section 606. Section 1010.103(h) of the regulation states:
>
> > "Department proceeding" means, for the purposes of section 606 of Pub.L. No. 95–91 (42 U.S.C. 7216), any judicial proceeding, Department hearing, application, rulemaking, order, license, contract, grant, award, fund transfer, claim, controversy, charge, accusation, or arrest, in which the Department is directly involved.
>
> As defined by this regulation, the management and operating contract for Systems Engineering, Development, and Management of the Nuclear Waste Management System clearly is a "Department proceeding." *Moreover, given the breadth of the definition, I think the term encompasses much of the procurement process leading to contract award.* More specifically, it is my opinion that the process in this case became a Department proceeding *when the Source Evaluation Board was formally established on May 1, 1987, if not sooner. As Chairman of the SEB, Mr. Rousso*

> *participated in this Department proceeding.*

(DX 129 (emphasis added); Tr. 4928).

■ We think great weight should be given to this admission against interest, *i.e.*, that Mr. Rousso participated in a Department proceeding beginning at least by May 1, 1987, if not sooner, inasmuch as it is against the interest of the defendant and, further, it was voluntarily made within the scope of his authority and job responsibility while litigation was in progress, *post litem motam* (Tr. 4910–11). This court, in such instances, may reject a self-serving statement on the one hand and credit an adverse admission on the other even though both were made in the same document *after* litigation commenced. Justification for such is, of course, premised on the likelihood that the former statement is unreliable whereas the second statement—the admission against interest—exudes credence on the theory that no reasonable person would make a *false admission* against himself.[10] *See, e.g., United States v. Palumbo,* 639 F.2d 123, 127 (3d Cir.1981).

■ It is clear beyond cavil that these activities of Mr. Rousso—attending meetings with the task group, reviewing the draft SOW, chairing preliminary planning sessions, acting as unofficial chairman of the SEB, and then as official Chairman of the SEB in charge of rewriting the SOW and eventually producing the RFP—led to the execution of a contract, the effect of which constituted Department proceeding as contemplated under § 7216.

#### b. Any Controversy

■ Under the definition of "Department proceeding," the activities in which Mr. Rousso participated within the restricted period can be equally characterized as a "controversy." Giving ordinary words their ordinary meanings, "controversy" is defined as:

---

**9.** At Tr. 4926, Mr. Goldenberg testified that— "This opinion addresses the question of when the SEDM procurement became a department proceeding."

**10.** The court finds that defendant-intervenor conceded that Defendant's Exhibit 129 "speaks for the Department of Energy." Tr. 4921–23.

The action of disputing or contending one with another; dispute, debate, contention.... discussion in which opposite views are advanced....

*The Oxford English Dictionary*, 855 (2d ed. 1989).

SAIC had two contracts with DOE at the Yucca Mountain, Nevada site *prior to and during* the solicitation for the SEDM contract, *supra.* The first SAIC contract was to provide "technical and management support services" for the Department of Energy's Office of Civilian Radioactive Waste Management Program at the Yucca Mountain site (the T & MSS contract). This contract was originally awarded to SAIC in 1983, and was renewed, following a re-bid in February 1987. By the terms of the 1987 agreement, SAIC has the responsibility for certain licensing activities, quality assurance .with regard to the entire program, including but not limited to, cost schedule reporting, configuration management, change control, and public outreach. In short, SAIC has been and is presently "the overall integrator for the Yucca Mountain work" (Tr. 213). This contract was awarded as a three-year base contract with seven one-year options for DOE, which could conceivably extend to 1997.

The second contract with OCRWM, held by SAIC and involving the Yucca Mountain repository, is known as the "LSS contract," and was executed in 1987. In the words of Dr. McGrath, the LSS contract required SAIC:

> ... to build a needs analysis for a licensing support system in support of the overall, what we call ocher emission, and to develop specifications for the hardware and software which would ultimately be composing the licensed support system.

(Tr. 215).

Dr. McGrath, who is also thoroughly familiar with the SEDM procurement, in that he was a member of SAIC's bid committee regarding the SEDM, identified three items required by the SEDM RFP that are not already covered by SAIC's existing contracts (design work for the repository surface and subsurface facilities; overall li-

censing support of DOE headquarters; and interface with the NRC) (Tr. 215). Additionally, he testified that SAIC would be prevented from being the prime contractor for the SEDM because "[w]e would be in conflict with some of our roles that we perform currently in Nevada, and which we'll continue under the SEDM contract" (Tr. 218). In other words, because the SEDM contract, to some extent, overlapped the responsibilities of SAIC as the overall integrator for the Yucca Mountain work, the threshold problem, discussion, or controversy of DOE's SEB (and its predecessor, the Preliminary Planning Session), chaired by Mr. Rousso, was to ameliorate the potential duplication of work scope. Given the critical nature of this issue, we find that Mr. Rousso was undoubtedly well aware of this controversy within the one-year restricted period, *i.e.*, that the SEDM procurement would impact on SAIC's existing contract(s). On cross-examination, the following testimony was elicited from Mr. Rousso:

> Q. Mr. Rousso, I'd like to go back to May 30, 1987, and the period of time before that.
>
> Now, during that period of time, you knew that SAIC was a participant in OCRWM's nuclear waste program, correct?
>
> A. Yes.
>
> Q. And you knew that they were working that Yucca Mountain site?
>
> A. Yes.
>
> Q. And you knew that they were integrating the work of other contractors participating at the Yucca Mountain site?
>
> A. I'm not sure in that time frame that I knew with any real specificity what kind of work they did; I just knew that they were a contractor at the Yucca Mountain site.
>
> Q. The SEDM contract calls for the integration of the work of all of the participants in the nuclear waste program, doesn't it?
>
> A. In a general sense, yes.
>
> Q. And that work is being performed under contracts, currently?

A. Most of that work is currently under contract, yes.

Q. And the SEDM contract envisions that some of that work will continue after the award of the SEDM contract, correct?

A. Yes.

Q. And it also envisions that some of that work will be subsumed by work performed by the SEDM contractor?

A. That's correct.

Q. And that's part of the SEDM contract?

A. Yes.

Q. And that's part of the concept for the SEDM contract?

A. Yes.

Q. And you knew that back prior to May of 1987, correct?

A. That the concept was that this contract would provide an integrated or pulled together pieces of the program and possibly transfer work to itself that was currently being done? Yes.

Q. Yes, that some work would continue and some work would be subsumed?

A. Yes. And some work would be new.

Q. Correct. And you knew this because you had been involved in the development of the concept[?]

A. More so because I am involved in trying to do the Statement of Work.

Q. Now, given that SAIC was a participant at Yucca Mountain, and you knew this back in May of 1987, you also knew that the SEDM contract was going to have some impact on SAIC, did you not?

A. As one of the contractors, it could have a potential impact on SAIC, yes.

Q. And you knew this back in May of 1987?

A. Yes.

\* \* \* \* \* \*

Q. But you did know as of May of 1987 that there would be some impact on SAIC's work at Yucca Mountain as a result of the SEDM contract?

A. I did not know that there would be an impact. I know that they would be

under consideration for a possible impact. Whether any work would actually transfer or not, I did not know.

Q. So you can't say as of May of 1987, there might have been an impact or you thought there might have been an impact but you didn't know whether there would in fact be an impact?

A. Yes. I think they were subject to being reviewed and subject to a work scope change.

Q. And you knew that as of May of 1987?

A. ... I would say, yes, because the Statement of Work went out June 2nd or 3rd of '87, so obviously we had to be writing it earlier, in May is a likely date, and therefore since it included the Tables, Tables 5.1 and 5.2 in the RFP, which listed all the potential current contractors and potential workload that was subject to review and potential change, that I would have to say, yes.

Q. That you did know that as of May of 1987?

A. It's conceivable that I did know that, yes.

(Tr. 5034–39). *See also* Mr. Rousso's testimony on direct when called by the plaintiff at Tr. 57–58.

Clearly then, even from the mouth of Mr. Rousso, there was concededly a vexing conflict. There was dispute or discussion within the one-year restricted period as to what the status of SAIC's existing contracts at the Yucca Mountain site would be following the execution of the SEDM contract. The record shows that SAIC exhibited great concern for the status of its Yucca Mountain contracts as well, because the conflict with respect to the scope of the SEDM contract and its existing contracts was much debated and clearly a provocative issue. This is so because as far back as April 1987, Ed Straker, of SAIC's bid acquisition committee, in a presentation to SAIC's Business Acquisition Council, listed the following as potential weaknesses to SAIC's chances of participating in the SEDM procurement:

(i) potential appearance of conflict given Las Vegas involvement; and

(ii) perception that Las Vegas is our share and SE & D (SEDM) would over-stretch capability.

In an update briefing to the SAIC Council in May 1987, under the heading "Impact on Current Contract," there was listed the following:

—some functions may move;

—anticipated growth may be lower and slower;

—some people may move, voluntarily or by fiat.

Notwithstanding the foregoing problems, Mr. Straker advised SAIC's Business Acquisition Council that—"[w]e are being encouraged to participate by DOE" (PXs 56, 60). From the above, the evidence is indisputable that the SEDM procurement—a contract for a "super integrator" of existing contracts being performed at the Yucca Mountain site—posed, as Mr. Rousso candidly admitted, "a lot of problems" (Tr. 50), or, if you will, a controversy with SAIC's existing contracts. In other words, the SEDM contract conceivably was to subsume some significant portion of the work being performed by SAIC under its existing contracts. Minutes from the SEB's meetings corroborate the foregoing in that they acknowledge discussions of such conflicts on the agenda. These discussions, as evidenced by the minutes, took place within one year of Mr. Rousso's departure from SAIC (PX 92).

To the extent that the subject of these conflicts or problems, in relation to the scope of the SEDM contract, were discussed and debated, it is fair to say that the evidence clearly supports a finding that there was a "controversy," and thus a Department proceeding within the contemplation of § 7216. As previously noted, DOE's Assistant General Counsel for General Law freely admitted the same and the court wholeheartedly agrees (DX 129). We find, therefore, that under both criteria, *supra,* the evidence adduced is clear and convincing that Mr. Rousso participated in a Department proceeding within the relevant period.

### 5. *Former Employer Is Substantially, Directly, Or Materially Involved*

The next element required to be established for a violation of § 7216 is that Mr. Rousso's former employer, SAIC, must have been substantially, directly, or materially involved in a Department proceeding. That involvement, of course, must have occurred within the restricted period. The evidence proffered by plaintiff, in this connection, can be divided into two categories: (i) involvement stemming from SAIC's efforts to be awarded the SEDM contract itself—whether as a subcontractor team member to Bechtel, or as a prime contractor; and (ii) involvement stemming from SAIC's existing contracts with OCRWM at Yucca Mountain that might be affected by the SEDM contract. The court addresses each category in turn.

### a. SAIC's Substantial, Direct, and Material Involvement in the SEDM Procurement

The fact of OCRWM's intention to award a contract to coordinate the activities at the Yucca Mountain, Nevada site was well known throughout the energy industry (Tr. I 70). SAIC, having learned of the SEDM procurement, was very interested in participating in the SEDM contract (Tr. 234 and 241; PX 57). On April 2, 1987, OCRWM generated a list of prime contractors who had responded to the *Commerce Business Daily* notice (PX 6). This document served as OCRWM's "current source list," and each contractor shown thereon received from OCRWM a copy of the RFP as requested. SAIC was on that list (PX 6; Tr. 236). SAIC also formed an acquisition (bid) committee on February 27, 1987, in order to formulate a strategy as to how SAIC could best become involved with the SEDM contract (Tr. 234). This acquisition committee, chaired by Dr. McGrath, was formed in response to OCRWM's publication in the CBD on February 13, 1987, of its intention to issue an RFP for the SEDM contract.

Through a document summarizing a presentation made by SAIC's acquisition committee on May 29, 1987 to SAIC's Business Acquisition Council, headed by the Chairman of the Board of Directors of SAIC, the

record shows that SAIC not only knew a great deal about DOE's objectives and preferences regarding bidders, but said document also evidences the fact that SAIC "[was] being encourage[d] to participate [in the SEDM contract] by DOE" (PX 60). In fact, in an inter-office memorandum by Dr. McGrath, regarding notes and actions relating to the Acquisition Committee meeting of March 4, 1987, an issue noted for resolution was whether—"SAIC will bid for SE & D contract" (PX 53). Also pertinent to SAIC's involvement in SEDM is the fact that Ed Kay, the Deputy Director of DOE/OCRWM, sought the advice of Neal Carter, a SAIC employee, on "how the waste program should, and can be, integrated." This communication is evidenced by an inter-office memorandum from Dr. McGrath dated April 23, 1987 (PX 57).

Dr. McGrath himself also had several contacts with DOE regarding SAIC's involvement. That same inter-office memorandum, *supra*, which was distributed to all members of the acquisition committee, memorializes Dr. McGrath's statements to Ed Kay, OCRWM's Deputy Director, who worked closely with Sam Rousso as an *ex officio* member of the SEB. The memorandum contains the following statements:

> Kay made it very clear that he could not discuss the SE & D [SEDM] contract. I told him I could understand his position but would like to pass information on to him that might be useful. I told him that we were very interested in the SE & D [SEDM] contract because of our role in Las Vegas on NNWSI and because of our interest in being part of the SE & D [SEDM] contract team.

(PX 57). Additionally, on April 20, 1987, Neal Carter discussed with Jeff Neff, of DOE–Columbus, several aspects of the SEDM procurement, including Mr. Neff's expectations that the SEDM procurement would "absorb significant scope of onsite integrators" (PX 58).

More pertinent to SAIC's material involvement in Department proceedings, however, is the evidence of Dr. McGrath's several visits and/or contacts with Sam Rousso during the restricted period. At the hearing on the permanent injunction, counsel for plaintiff introduced into evidence Dr. McGrath's business planner/calendar for the period of February 9 through April 26, 1987 (PX 51). The calendar contains numerous references to Sam Rousso and the SEDM procurement—within one year of his departure from SAIC. Close inspection of the calendar discloses that at the top of the column on each page just to the left side of the column captioned "Action," there is printed the following over the abbreviations for the days of the week:

"Plan (/) Execution (X)".

These references instruct the user to mark a slash ("/") beside activities that are *planned*, and an "X" beside activities that have been *completed*. Therein at least four entries are found with X's beside Mr. Rousso's name. As Dr. McGrath's calendar contains X's beside some activities and single /'s beside others, counsel for plaintiff asked him if an "X" beside a particular entry indicates that that task had been completed. Dr. McGrath answered:

> Not all of the time. Unfortunately, I am not quite as disciplined as that, but sometimes it does indicate that. Other times it means that I did not do something but I just crossed it off.

(Tr. 267). In connection with the foregoing, we note on page 39 of the calendar, in the column for Thursday, February 12, 1987, the following entry:

> "X—Ringer—# for Stein Rousso
> Super Integrator
>
> . . . . .
>
> 586–9116 Sam Rousso".

McGrath testified as follows with respect to the foregoing:

> Q. What were you referring to there when you put that down?
> A. I suspect that had to do with—I am not actually sure, but I think that number means telephone number.
> Q. For whom?
> A. Stein, Rousso, Super Integrator.
> Q. Is that Sam Rousso?
> A. Yes. It would be Ralph Stein and Sam Rousso.

Q. And what is Super Integrator, is that the SEDM?

A. That refers to the SEDM procurement.

Q. And what does the X mean under the T for Thursday the 12th of January, 1987?

A. That would have meant that Ringer obtained telephone numbers.

Q. And who is Ringer?

A. She is a secretary.

Q. And did you delegate that task to Ringer?

A. I would have, yes.

Q. And this is your handwriting, is it not?

A. Yes, it is.

Q. And two lines under where it says "Rousso Super Integrator," there is a telephone number, a number and a name?

A. Yes, that is correct.

Q. Can you read that?

A. It says, "586–9116, Sam Rousso."

Q. At that time, did you make a call to Mr. Rousso?

A. I do not remember making any calls to Mr. Rousso.

Q. Why did you delegate to Ms. Ringer to get a number for Stein and Rousso regarding Super Integrator on January 12th, or I am sorry, February 12th of 1987?

A. I do not remember.

(Tr. 268–69).

Counsel for plaintiff then turned Dr. McGrath's attention to page 41 of the calendar—representing the week of Monday, February 16, through Sunday, February 22, 1987. The calendar indicates that Dr. McGrath traveled by plane to Idaho on Tuesday, San Diego on Wednesday, then on to Las Vegas late Wednesday, and back to Washington, D.C. on Friday. In the column representing Wednesday, February 18, 1987, there is contained the following entry: "X Rousso 202–586–9116." With respect thereto, the following is an exchange between plaintiff's counsel and Dr. McGrath:

Q. Can you read that entry?

A. It says, "Rousso, 202–586–9116."

Q. And that was Mr. Rousso's telephone number, was it not?

A. I think so.

Q. That is the same number that you had from the prior page?

A. That is correct.

Q. But there is a prefix there for Washington, D.C., is there not?

A. Yes.

Q. Why is that?

A. I am not sure.

Q. Were you not out of town at that time?

A. It looks like I was out of town from Tuesday mid-day until sometime Friday. Oh, wait. Yes, that is correct.

Q. Does that entry indicate that you called Mr. Rousso from out of town on Wednesday, February 18, 1987?

A. Maybe.

Q. Does it indicate anything else?

A. I am not sure what your question is.

Q. You said that it maybe indicates that, and your answer is implicit that it might indicate something else.

I am asking you if it indicates anything else, and if so what is it?

A. This is an event which took place two years ago. And there are other entries in there which I have telephone numbers with no indication, et cetera. Unfortunately, my system is not that perfect that I would be able to say that because of a particular entry that in fact I did something.

\* \* \* \* \* \*

Q. On February 18th, 1987, did you call Mr. Rousso?

A. I don't remember calling Mr. Rousso.

Q. Does this entry in your diary indicate that you called Mr. Rousso?

A. Not necessarily.

Q. What does it indicate?

A. That I wrote his telephone number down.

Q. What does the "X" indicate under Wednesday, February 18th of 1987?

A. I'm not sure.

Q. It's your diary, isn't it?

A. Yes, it is.

Q. But you don't know what the "X" you placed in your diary means?

A. Well, I could put it there for many reasons.

Q. Was it your practice to put one diagonal line from the top left-hand corner to the bottom right-hand corner first and later put the other diagonal line from the upper right-hand corner to the bottom left-hand corner, second?

A. Sometimes, yes.

Q. Was that your customary practice?

A. And sometimes I put no line. Either a diagonal or an "X".

Q. So, you have no recollection of calling Mr. Rousso on February 18th of 1987?

A. No, I have no recollection.

Q. Did you call him on February 19th, 1987?

A. I have no memory of calling Sam Rousso.

Q. And this doesn't help you?

A. No, it does not.

(Tr. 269–274).

Plaintiff's counsel, seeking to establish that Dr. McGrath was involved in the SEDM procurement at the time these references to Mr. Rousso were entered, called his attention to an entry on page 43 of the calendar. This entry, during the last week of February 1987, reads—"McGrath Organize SE & D contract pursuit." This exchange followed:

Q. Is that something you were doing during this period of time?

A. It could refer to—

Q. Would you answer my question?

A. I don't know.

Q. Do you know why you put it in your diary then?

A. As a note to myself.

Q. If you would turn to the next page of the exhibit, page 44 at the top. Do you see there is an entry under Wednesday, March 4th?

A. Yes.

Q. What is that entry?

A. It says at 9:00 a.m., test SE & D contract.

Q. What does that refer to?

A. I would say it refers to a meeting of the acquisition committee.

Q. And did that meeting take place on that date?

A. I think it did.

* * * * * *

Q. Could you look at the next page of the exhibit and, specifically, page 49 of your diary for 1987? And on the bottom half, there is an entry for Thursday, March 19th, 1987. There's an "X" under the Thursday. Can you read that entry?

* * * * * *

[A.] It says, "Arrange to see Sam Rousso."

Q. Now, there is a key in your diary which defines plan and execution, is there not?

A. Yes, that's correct.

Q. And what is the symbol that is used for execution?

A. [It's] an "X".

Q. Did you on or about March 19, 1987 arrange to see Sam Rousso?

A. I do not remember arranging to see Sam Rousso.

Q. Do you know why you entered this in your diary on March 19th, 1987?

A. I do not.

Q. And could you refer to Line F on page 49?

A. It says, again, "Meeting with Sam Rousso."

Q. Do you recall whether you met with Sam Rousso on March 19th, 1987?

A. I have no memory of meeting with Sam Rousso then.

Q. Did you meet with Sam Rousso on that date?

A. I have no memory of meeting with Sam Rousso on that date.

Q. And, again, this is your handwriting in the diary?

A. Yes, it is.

Q. Why did you put this entry, "Meeting with Sam Rousso for March 19th, 1987."

A. I don't know.

Q. Would you refer to the next page of the exhibit, specifically, page 50? On the bottom half of the page, there is an entry next to G. Can you read that?

A. G. It says, "S. Rousso scheduled for SE & D procurement."

Q. And is the S. Rousso that that refers to Sam Rousso?

A. Yes, it would.

Q. And there is an "X" under Tuesday, March 24th, 1987. Do you see that?

A. Yes, I do.

Q. Did you place that "X" there?

A. I would say I probably did.

Q. On or about March 24th, 1987, did you place this entry in your diary regarding Mr. Rousso, the one that is at Line G?

A. That is my handwriting.

Q. Why did you place that entry regarding Mr. Rousso in your diary?

A. I don't know.

Q. On or about March 24th, 1987, did you contact Mr. Rousso to obtain information about the schedule for the SE & D procurement?

A. I have no memory of contacting Sam Rousso about the SEDM procurement.

(Tr. 274–77).

In an earlier portion of Dr. McGrath's testimony, before plaintiff's counsel introduced the calendar, he was asked directly about his contacts with Mr. Rousso during the one-year period following Mr. Rousso's departure from SAIC. Dr. McGrath stated then that he could remember only one occasion on which he had met in person with Mr. Rousso. According to this testimony, the meeting took place in either April or May 1987 in Mr. Rousso's office at DOE, *i.e.,* in the Forrestal Building in Washington, D.C., and that it was an unannounced visit at which no business was discussed (Tr. 259–60). The following is an exchange between plaintiff's counsel and Dr. McGrath *prior* to the time the calendar was introduced:

Q. How long did you meet with Mr. Rousso on that occasion?

A. I do not remember exactly. It was a drop-in call, it was not a set up appointment. And I was in DOE Forrestal for other business, and I just stopped by unannounced. And Sam [Rousso] was there, and I said hello to him. It was probably a minute in terms of the duration of the meeting.

Q. Just a short couple of minutes meeting?

A. Yes.

\* \* \* \* \* \*

Q. Who else was present during that meeting?

A. It was my recollection that it was Neal Carter.

Q. Who is Neal Carter?

A. He is an employee of SAIC.

Q. What role if any did he have with respect to the SEDM procurement?

\* \* \* \* \* \*

A. At that time, he was a member of the Acquisition Committee.

THE COURT: At SAIC?

THE WITNESS: At SAIC.

BY MR. WECKSTEIN:

Q. The Acquisition Committee for the SEDM procurement?

A. Yes.

Q. And what did you discuss with Mr. Rousso on this one occasion in April or May of 1987?

A. I do not remember discussing anything in a business sense. It was more of pleasantries, "Hi, Sam, I just happened to be walking by to say hello."

Q. Did you discuss the SEDM procurement?

A. I do not remember ever discussing the SEDM procurement with Sam Rousso.

Q. So the answer is no?

A. That is correct.

Q. Did you discuss SAIC's work at Yucca Mountain?

A. During that period, I did not.

Q. Did you discuss the statement of work for the SEDM procurement?

A. I did not.

Q. Did you discuss whether or not Mr. Rousso was a member of the Source Evaluation Board for the SEDM procurement?

A. I did not.

Q. So it was a short meeting that lasted?

A. Ten minutes, fifteen.

Q. And you do not remember the specific topics, but you do remember that you did not discuss items?

A. Yes. You know, I realized that Sam was a former SAIC employee, but I was not going to discuss anything with Sam that might put him in an awkward position. I do remember that feeling. In fact, the first time that I discussed with Sam in a business sense was long after that.

Q. A business sense of what?

A. The involvement of SAIC in projects with OCRWM.

Q. Why did you take Mr. Carter to see Mr. Rousso in April or May of 1987?

A. We were together on some other meetings, and it was simply that we were walking through Forrestal together.

Q. Other than that one meeting with Mr. Rousso in the time period of June 1, 1986 to May 30, 1987, did you have any other meetings with Mr. Rousso?

A. Not that I remember.

Q. During the period of time from June 1, 1986 to May 30, 1987, did you have any telephone calls with Mr. Rousso?

A. I did not.

Q. During the period of time from June 1, 1986 to May 30, 1987, did you exchange any correspondence with Mr. Rousso?

A. I did not.

Q. During the period of June 1, 1986 to May 30, 1987, did you delegate to anyone responsibility for contacting Mr. Rousso?

A. I did not.

Q. Other than the one meeting that you mentioned, did you have any conversations or meetings of any kind with Sam Rousso from June 1, 1986 to May 30, 1987?

A. I did not.

(Tr. 260–63).

After going through the first five references to Mr. Rousso in the calendar with Dr. McGrath, plaintiff's counsel then referred Dr. McGrath to page 57 of the calendar representing Thursday, April 16, 1987:

Q. Could you look at the entry on page 57 for April 16th, 1987?

A. Yes.

Q. Can you read what it says next to the 2:00 time slot?

A. It says, "Ed Kay, 5A805/" it must be with Carter.

Q. What does it say underneath that for the 3:00 entry?

A. It says, "Rousso?"

Q. Is that Sam Rousso that that refers to?

A. That would refer to Sam Rousso, yes.

Q. Did you make those two entries?

A. Yes, I did.

Q. Why did you make those two entries next to 2:00 and 3:00?

A. I was down—I had a meeting with Ed Kay, a scheduled meeting and I think I put a question mark there, stop and see Rousso or something.

(Tr. 282).

Generally, the court considers Dr. McGrath's testimony to be incredulous, to say the least. This is particularly true with respect to the so-called drop-in meeting with Mr. Rousso, as well as the meaning of the "/" and the "X" in his business daily planner. The court notes that nowhere in Plaintiff's Exhibit 51 is there any explanation, comment, or marking consistent with his testimony that sometimes the "X" means that the task was completed and "[o]ther times it means that [he] did not do something but [he] just crossed it off" (Tr. 267). Facially, the marks beside each "Action" recorded with a "/" for "plan" of action or an "X" indicating that said plan

was executed are most logically, probably, and likely to be true, given the totality of the facts and circumstances. This is evident inasmuch as not one of the entries discussed above was ever actually *deleted* in an explicit manner or otherwise. Moreover, Dr. McGrath failed to identify those entries with X's beside them where, on the one hand, the activity was executed as planned, and where, on the other hand, those entries that reflected an activity which allegedly was cancelled. This court was not only unpersuaded by Dr. McGrath's testimony, but in fact finds it to have been extremely halting, less than candid, and probably evasive as to the foregoing.[11]

Several inconsistencies are readily apparent within Dr. McGrath's testimony. First, after testifying that his unannounced drop-in meeting in April or May 1987 with Sam Rousso lasted "probably a minute in terms of the duration," and later acknowledging that the meeting lasted for "a short couple of minutes," Dr. McGrath testified that that *same* meeting with Mr. Rousso lasted 10 to 15 minutes (Tr. 260–62). Thus, within approximately 15 minutes of testifying that the drop-in meeting lasted one to two minutes, he testified that the same meeting lasted 10 to 15 minutes. Additionally, after stating that his meeting with Mr. Rousso was "a drop-in call" and that he happened to be walking by and "just stopped by unannounced [and] Sam was there, and [he] said 'hello' to him," Dr. McGrath admitted recording the possibility of this meeting in his calendar *before* he even visited the DOE office that day (Tr. 282). Such testimony is obviously at variance with his previous statement that the April or May 1987 visit was a mere *drop-in* meeting. Dr. McGrath admitted that Neal Carter, a member of SAIC's acquisition committee, accompanied him on this "unannounced drop-in meeting" with Mr. Rousso in April or May 1987 (Tr. 260). The court finds that the entry on Dr. McGrath's business calendar for *Thursday, April 16, 1987,* noting Mr. Rousso's name as well as Mr. Carter's name, corroborates the admission that the so-called drop-in meeting in his diary was recorded *prior* to their visit with Mr. Rousso. The court further infers from these circumstances that since Dr. McGrath admitted that said meeting was possibly scheduled (and we so find) and lasted not one or two minutes but 10 to 15 minutes, such contact with Mr. Rousso related to the SEDM problems with reference to SAIC.

The record contains additional probative facts and circumstances, including but not limited to the following, warranting an inference that SAIC was materially involved in Department proceedings with OCRWM, within the one-year restricted period, regarding the SEDM procurement:

(i) Plaintiff's Exhibit 6, a list of contractors responding to the CBD, disclosed SAIC as a party interested in the SEDM procurement;

(ii) Plaintiff's Exhibit 56, the Briefing to Business Acquisition Council of SAIC, dated April 8, 1987, concedes that—SAIC has been a major participant in the DOE program since its inception; "[SAIC is] being encouraged to participate [in SEDM] by DOE"; SAIC formed a bid committee on February 27, 1987, responsible for proposal development, intelligence, and other mat-

---

11. The court is not unmindful of the fact that many witnesses testified as to events that took place nearly two years in the past. Normally, this court would not quote such substantial portions of a witness's testimony in the body of its opinion. However, much of the transcript, relating to the testimony of certain witnesses, tends to reflect the manner in which these witnesses testified. It is, therefore, revealing and probative with respect to the veracity of a witness. The court believes that the quoted passages of testimony will facilitate the reader's understanding of the court's factual findings. Specifically, that the veracity of Dr. McGrath is wanting.

Aside from his total inability to recall even the most elementary facts surrounding important elements of the case, Dr. McGrath could not explain five entries in his calendar pertaining to Mr. Rousso. Both Dr. McGrath and Mr. Straker, who accompanied him, as members of SAIC's acquisition committee, were charged with gaining intelligence on the SEDM contract and building contacts with members of OCRWM. That these two individuals could happen into Mr. Rousso's office, against this background, hold a 10–15 minute conversation, and not remember the subject matter of such conversation strains credulity.

ters; one of its weaknesses was the "potential appearance of conflict"; its "[b]riefing objective—[is to] increase knowledge and awareness of SAIC to high ranking officials of DOE"; and with respect to intelligence, its objective was—"weekly interactions with DOE/OCRWM and DOE/NV"; and

(iii) Plaintiff's Exhibit 53, an inter-office memorandum by Dr. McGrath dated March 6, 1987, notes that "SAIC will bid for SE & D [SEDM] contract"; "SAIC will be in the competition for the SE & D contract"; and "[i]nformal discussions will be held at the following DOE offices" (Office: DOE/Wash., et al.—Responsible people: McGrath).

In any event, regardless of whether or not Dr. McGrath testified truthfully, he could not refute the clear evidence contained in his business calendar of his referenced contacts with Mr. Rousso. He could testify only that—"I am not sure"; "I don't remember"; "I don't know"; "I have no recollection"; "I don't think so"; and "I don't recall." These types of responses were repeated by Dr. McGrath on no less than 120 occasions. Moreover, Dr. McGrath admitted that he met with at least one member of OCRWM to express his interest in being awarded the SEDM contract.

This interest was either as a prime contractor or a subcontractor, and SAIC took a number of positive steps to make this known to "high ranking officials of DOE" (PX 56). From the foregoing, the court finds that the evidence is clear and convincing that SAIC qualifies as one substantially, directly, *or* materially involved in Department proceedings within one year of Mr. Rousso's employment at DOE.

b. SAIC's Direct, Material Involvement in SEDM Because of Yucca Mountain Site Contracts

■ Counsel for the defendants argue that plaintiff's contention, that SAIC's relationship with OCRWM on other contracts at Yucca Mountain constitutes involvement in a Department proceeding with the SEDM procurement in view of its SOW, is baseless. We disagree, and find that because of OCRWM's pre-existing contracts with SAIC and the former's concern for potential OCIs, the latter was clearly "involved" as contemplated by § 7216.

The § 7216 requirement that the former employer's involvement be substantial, direct, *or* material is clearly a disjunctive and not a conjunctive criterion. That is to say, SAIC's involvement will still satisfy this element of the statute if plaintiff proves that such involvement was *either* substantial, material, *or* direct.

As has been found, SAIC had two pre-existing contracts with OCRWM that would be affected by the SEDM work. Some of SAIC's responsibilities under the existing contract stood to be subsumed by the SEDM contract. In fact, when asked by plaintiff's counsel whether SAIC's contract at Yucca Mountain could end as a result of the SEDM contract being awarded, Sam Rousso admitted that this was a possibility (Tr. 5035).

In addition to the controversy as to what impact the SEDM contract would have upon existing contractors such as SAIC, there was also the question of whether existing contractors' participation in the SEDM contract would present OCIs. OCRWM officials dedicated a considerable amount of time formulating OCI guidelines for the SEDM procurement (PX 26). These guidelines were designed, in large measure, to ameliorate the obvious and apparent conflicts that would surface in the face of SAIC's current responsibilities at Yucca Mountain and the potential for duplication if it were a Bechtel team member. The minutes of OCRWM's Preliminary Planning Session and the SEB are replete with references to discussions of troubling OCI issues, draft memoranda of the OCI guidelines, and a plan to announce the availability of the OCI guidelines, as early as May 4, 1987.

In preparing the OCI guidelines (PX 26), OCRWM was concerned that existing contractors such as SAIC (a member of the winning team) might enjoy an "unfair competitive advantage." Upon award of the SEDM contract, information obtained under existing contracts, and not otherwise

available to the public, might be used to its competitive advantage. OCRWM was also concerned with bias, as the following paragraph from the OCI guidelines makes clear:

> ... if one of the existing integration/technical support service contractors at a candidate repository site were to be successful in the subject SEB competition, a part of its responsibility would include the review and evaluation of data that was developed by it while continuing to provide services to the cognizant Project Office. Were this situation to arise, the issue would not be whether an apparent OCI is present; it clearly would be. The issue is, rather, the extent of conflict and whether it can be avoided. If such a conflict cannot be avoided, award might still be made in face of the conflict after a determination by the Secretary that award is otherwise in the best interest of the Government.

(PX 26, p. 5).

While such a situation has in fact arisen by virtue of SAIC's status as a proposed Bechtel team member, all that matters with respect to the issue presently before the court is—whether the problem of SAIC's existing contracts with OCRWM relating to work on the SEDM contract creating an apparent or actual conflict constitutes material, direct, *or* substantial involvement in a Department proceeding. The court finds that it in fact does so. The issues—whether and to what extent SAIC's existing contracts would be affected; whether existing contractors, such as SAIC, might enjoy an "unfair competitive advantage" in bidding on the SEDM contract; and whether a conflict would be created if an entity such as SAIC were to be successful in the SEDM competition—were the subject of extensive, if not exhaustive, discussion among OCRWM officials.

Here again, we believe that the record is saturated with an abundance of credible evidence that SAIC was directly or materially involved, and probably both, in a Department proceeding during the restricted period with regard to the SEDM procurement due to its Yucca Mountain contracts.

The following evidence is probative of these operative facts:

(i) Plaintiff's Exhibit 92 contains copies of the minutes of the Preliminary Planning Session (the predecessor of the SEB meeting) and the minutes of the SEB within the restricted one-year period. The following minutes indicate discussions regarding both OCI issues and "Isolation of proposal teams (existing contractors)": March 11, 1987; March 18, 1987; March 24, 1987; April 3, 1987; April 8, 1987; April 9, 1987; April 17, 1987; April 20, 1987; April 23, 1987, April 24, 1987; April 29, 1987; May 1, 1987; and May 26, 1987;

(ii) Plaintiff's Exhibit 52, a SAIC agenda memorandum dated March 4, 1987, indicates as an issue for resolution— "DOE/NV (Veith) Problems with SAIC Actively Pursuing SE & D [SEDM] Contract";

(iii) Dr. McGrath admitted that SAIC could not be the integrator for the SEDM contract because as he testified—"[w]e would be in conflict with some of our roles that we perform currently in Nevada, and which we'll continue under the SEDM contract" (Tr. 218);

(iv) Plaintiff's Exhibit 53, SAIC's inter-office memorandum dated March 6, 1987, executed by Dr. McGrath indicates that he had the responsibility of arranging the Beyster/Rusche meeting for the future (approximately 4 weeks). *See also* PX 56;

(v) Plaintiff's Exhibit 57, SAIC's inter-office memorandum from Dr. McGrath, dated April 23, 1987, disclosed that he, as encouraged, *supra*, did in fact have a "[d]iscussion with Ed Kay (Deputy Director of DOE/OCRWM)";

(vi) Plaintiff's Exhibit 60, Update Briefing to Business Acquisition Council of SAIC, dated May 29, 1987, conceptualized its strategy to be the principal subcontractor, not the prime, because—"DOE is looking for someone like [entities are named but SAIC is not included]" and "conflict situation probably insurmountable for any of current site contractors as prime (eliminates SAIC ...)." Issue *to be resolved* was—"work on conflict of interest resolution"; and

(vii) Tr. 5034–40 regarding the effect of the SEDM contract on SAIC's Yucca Mountain contracts, as previously noted, Mr. Rousso admitted that—"I did know that there would be an impact."

Collectively, the foregoing clearly establishes that SAIC's interests in its existing contracts were jeopardized by the scope of the SEDM contract.

To summarize, the court finds two grounds upon which to base its finding that SAIC was substantially, directly, or materially involved in the SEDM contract within one year of Mr. Rousso's departure from SAIC. The first is that it was a prospective bidder during the time in question and publicized that fact. Thus, it stood to be the beneficiary of an unfair competitive advantage by the award of the SEDM contract, resulting in apparent conflicts of interest and possibly an actual conflict of interest if it were to be awarded the SEDM contract. The second is that because SAIC had existing contracts with OCRWM, relating to integration and technical support services at Yucca Mountain, and because the SEDM contract would subsume or impact these existing contracts, we hold that SAIC was directly, materially, and substantially involved in a Department proceeding, relating to the SEDM procurement, within the prohibitive period.

### 6. *Knowing Participation*

■ The final element that must be established in order to find that there has been a violation of § 7216 is that the former employee (Mr. Rousso) must have *knowingly* participated in a Department proceeding within the prohibitive period. This requirement is referred to by the defendant-intervenor as the *"mens rea* element of the statute—the necessity that there is a *knowing* violation" (Brief, June 6, 1989, p. 32) (emphasis in original). The defendants do not make a case for the proposition, and the court is not convinced, that by inserting the adverb "knowingly" before the word "participate" in § 7216 Congress intended that the plaintiff carry the burden of proving that the former employee must have *known* that his former employer was substantially, directly, or ma-

terially involved in a Department proceeding. To the contrary, the adverb "knowingly," as used, simply modifies the verb "participate" which it precedes. In other words, the statute which provides only for a civil penalty (*see* 42 U.S.C. § 7218(b)) does not require, as the defendants maintain, that Mr. Rousso must be shown to have "knowingly violated" the statute. Rather, it requires only that his knowing participation constituted a violation where all of the other operative elements are properly established.

■ Given this interpretation, Mr. Rousso's admitted involvement relative to the draft SOW, his attendance and participation at the Preliminary Planning Session for the SEDM procurement, all of his activities in connection with his position as "unofficial SEB Chairman," and all activities in which he engaged as the SEB Chairman collectively satisfy the "knowingly participate" element of § 7216. Probative evidence in this regard may be summarized to include, *but is not limited to*, Plaintiff's Exhibit 92 (Minutes of the Preliminary Planning Session and the SEB between March 11, 1987 and May 26, 1987), Plaintiff's Exhibit 29 (DOE's Acquisition Regulations Handbook), and Mr. Rousso's testimony at Tr. 49–51, 64–66, 70, 79–80, 2549, and 5034–40. For the foregoing reasons, the court holds that Mr. Rousso did in fact knowingly participate in a Department proceeding in which, as has been discussed, his former employer was substantially, materially, or directly involved within the one-year restricted period.

■ Even assuming *arguendo* that plaintiff must prove, by the requisite quantum of evidence, that there was a "knowing violation" of § 7216 by Mr. Rousso, as defendants contend, such a misreading will give them no comfort. This is true because § 7211(d), Title 42 U.S.C., a definitional section relating to § 7216, provides, in pertinent part, as follows:

(d) Knowledge of interest, status, or position

For the purposes of section ... 7216 of this title *an individual shall be deemed to have known of or knowingly commit-*

*ted a described act* or to have known of or knowingly held a described interest, status, or position *if the employee knew or should have known of such act, interest, status, or position. ...* (emphasis added). As such, the issue of whether Mr. Rousso knowingly participated in the proscribed act is actually one of whether he "should have known of such act."[12] Clearly, as discussed, *supra,* Mr. Rousso was well aware of the proscriptions of § 7216 *before* he even commenced employment with OCRWM in June 1986. This is an indisputable fact because Ms. Fonner's opinion letter of May 28, 1986 (PX 42) advised Mr. Rousso that "the provisions of section 606(a) and (b) [§ 7216] will be applicable to you." Moreover, Mr. Rousso admitted receiving said letter. This being the case, one might reasonably have expected that Mr. Rousso, out of an abundance of caution, would have recused himself in any matter in which SAIC was involved during the restricted period. Unfortunately, such did not occur notwithstanding the fact that Ms. Fonner notes in her opinion letter Mr. Rousso's affirmation to her that:

> [He] ... informed [her] that [he] will *not* be asked to participate in matters relating to [SAIC] ... *during the first year of your DOE employment.*

(PX 42, emphasis added).

To begin with, the fact that SAIC received a copy of the RFP and the draft SOW, in view of its response to the February 13, 1987 CBD notice, was documented. OCRWM maintained a list (dated April 2, 1987) entitled "Current Source List by Proposal Request" containing the names and addresses of every firm that requested the RFP (PX 6). The defendants maintain that Mr. Rousso was not aware that the name of SAIC was included on that list. It would have taken Mr. Rousso less than two minutes to review the list in order to ensure that he was not participating in a matter involving SAIC. Had he done so, he would have realized that SAIC was interested in bidding on the SEDM contract.

In this regard, the defendants next contend that all the actions taken by SAIC, prior to May 29, 1987, relating to the SEDM procurement merely evidence SAIC's "interest," not its *"involvement,"* as § 7216 proscribes. We find this reasoning unpersuasive. Moreover, we think that it is sufficient to say that the semantic distinction advanced here misses the mark.

To suggest that because Mr. Rousso only knew of SAIC's "interest" in the SEDM contract, and not its involvement in the SEDM procurement, he cannot be said to have knowingly participated in a Department proceeding in which SAIC was clearly "involved" is tenuous at best. Carried to its logical extreme, the defendants' hospitable interpretation of § 7216 would make that provision totally impotent, since any activity short of submitting a bid could just as easily be regarded by them as a demonstration of "interest," but not "involvement."

Had Mr. Rousso, upon reading the current source list, still entertained some doubt as to whether SAIC's interest in the SEDM procurement, of which he should have been aware, constituted "involvement," he could have, and should have, taken steps to make an appropriate inquiry. He failed to do so in the face of Plaintiff's Exhibit 42. As Mr. Rousso has testified, he met with Dr. McGrath on at least one occasion that he could remember. This meeting took place on or about April 16, 1987, within the restricted period, after SAIC's name had been placed on the current source list of April 2, 1987. Mr. Rousso might have taken the opportunity to simply ask Dr. McGrath what actions SAIC had taken towards obtaining the SEDM contract award. Interestingly, Mr. Rousso testified that Dr. McGrath was accompanied (at the drop-in meeting) by Ed Straker (Tr. 97), of SAIC's bid acquisition committee. On the other hand, Dr. McGrath claims to have been accompanied at that same meeting by Neal Carter (Tr. 260 and 348), also of SAIC's bid acquisition commit-

---

12. Since Congress used the phrase "known of such act," and not words to the effect—"known of the illegality of such act," we believe this circumstance further supports the court's interpretation of "knowingly participate." *See* 42 U.S.C. § 7211(d).

tee. Perhaps it is not unreasonable to infer that both witnesses testified accurately. It may be that there were actually at least two meetings with Mr. Rousso, inasmuch as neither testified that both Messrs. Carter and Straker accompanied Dr. McGrath when he met with Mr. Rousso.

Given the above observations and the evidence contained in Dr. McGrath's calendar, when coupled with the reasonable inferences which may be deduced therefrom, the court finds that Mr. Rousso had an unspecified number of contacts with Dr. McGrath. These contacts, exceeding one in number, occurred during the period from May 30, 1986 to May 29, 1987, and therefore Mr. Rousso could and should have easily ascertained the extent of SAIC's SEDM–related activities.

It is indeed hard to imagine how Mr. Rousso managed, as he claims, to have avoided exposure to SAIC's aggressive marketing strategies, *e.g.,* building a relationship with OCRWM, as well as its intelligence activities (PXs 56, 60). Members of SAIC met and/or had discussions with Ed Kay (PX 57), Jeff Neff (PX 58), Don Veith, Don Bray (PX 54), possibly the then Under Secretary of DOE, and Ben Rusche (Tr. 325–27), all of whom apparently were Sam Rousso's colleagues. It is only logical, from the totality of the facts and circumstances, to infer that Mr. Rousso should have learned of the extensive marketing and other activities in which SAIC was involved.

We find, therefore, that the record establishes by the requisite clear and convincing evidence that Mr. Rousso actually knew (or at least should have known) of the existing contracts that SAIC had with OCRWM, as well as its (SAIC's) SEDM involvement within the restricted period, and that he knowingly participated therein (Tr. 5034–39). Quite simply, to the extent—that SAIC was a prospective bidder for the SEDM contract, that SAIC's existing contracts with OCRWM stood to be affected or impacted by the award of the SEDM contract, and that said circumstances constituted substantial or material involvement in a DOE "Department proceeding"—it is

undeniably true on this record that Mr. Rousso knew of such involvement *prior* to May 29, 1987.

The court finds, therefore, that plaintiff has properly established by clear and convincing evidence that Sam Rousso violated § 7216 by knowingly participating in the SEDM procurement within the one-year restricted period.

B. Prejudice

1. *No Direct Proof Required Where Conflict of Interest Statute Is Violated*

 Having concluded that plaintiff has established, by clear and convincing evidence, that 42 U.S.C. § 7216 was violated, we now turn to the question—whether that proof is, *ipso facto,* sufficient grounds upon which to grant the requested injunctive relief. We find, *infra,* that the overriding public policy concerns sought to be protected by Congressional enactment of § 7216 makes the violation of the elements of this statute a basis for injunctive relief, without requiring any proof of prejudice.

The defendants forcefully contend that any statute violated in connection with procurement matters must be shown to have prejudiced the plaintiff in order for it to be entitled to relief. For this position, the defendants rely upon the opinion of the Court of Appeals for the Federal Circuit in *CACI Field Services, Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988). In *CACI Field Services,* the Federal Circuit dismissed the appeal of a disappointed bidder because it alleged *only* that the Claims Court erred in finding no violation of a regulation, and did not also allege error in the Claims Court's finding that no *prejudice* was visited upon the plaintiff. There the court stated that:

[Petitioner] appears to assume that a showing of differences in evaluation factors and weights *ipso facto* establishes prejudice. As stated by the Claims Court ... *prejudice is a separate element which must be proven.*

*Id.* at 466 (emphasis added). The Claims Court has also held in *DeMat Air, Inc. v. United States,* 2 Cl.Ct. 197 (1983), that in

order to successfully challenge a procurement decision, a plaintiff must generally show that there has been a clear *and prejudicial* violation of a statute or regulation. *Id.* at 202.

This requirement of prejudice has its historical basis in the predecessor Court of Claims' case, *Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200 (1974), wherein the court stated as follows:

> [I]f one thing is plain in this area it is that not every irregularity, no matter how small or immaterial, gives rise to the right to be compensated
>
> . . . .

*Id.* at 573, 492 F.2d at 1203. The court continued:

> [I]t may be that even a proven violation of some procurement *regulation,* in selecting the competitor, will not necessarily make a good claim. Not every regulation is established for the benefit of bidders as a class, and still fewer may create enforceable rights for the awardee's competitors.

*Id.* at 578, 492 F.2d at 1206 (footnote omitted) (emphasis added).

We so read the Federal Circuit for the reason that in *CACI Field Services, Inc.* the court cited to *DeMat Air, Inc.* and *Keco Industries* as the bases for its finding, as both parties recognized, that *CACI Field Services* was required to prove "a 'clear and prejudicial' violation of a procurement statute or regulation" in order to prevail. In the context of a violation of a procurement regulation or statute not seeking to address the subject of conflicts of interest, this court agrees with the defendants that *CACI Field Services* controls. However, neither *CACI Field Services* nor *Keco Industries* turned on the violation of a distinctly focused conflict of interest statute. The case at bar does and, accordingly, is clearly distinguishable.

Precedent teaches that where the violation concerns a conflict of interest statute, as here, the high hurdle of prejudice is removed from the path of the plaintiff. In this connection, the United States Supreme Court, in *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), stated that although invalidation of a contract is not specifically expressed in the conflict of interest statute, where the contract is made in violation of the statutory prohibition, the government is precluded from enforcing a contract that has been infected by a violation of a conflict of interest statute. *Id.* at 525, 549, 566, 81 S.Ct. at 297, 309, 317. This is true regardless of whether corruption (or actual loss) can be proven. The fact that the essential purpose of the statute would be offended if the contract were enforced compels invalidation of such a contract. *See id.* at 563, 81 S.Ct. at 316.

The Supreme Court in *Mississippi Valley* placed great emphasis on the legislative purpose behind the statute there in question, 18 U.S.C. § 434, a predecessor to 18 U.S.C. § 208 (The Ethics in Government Act). Section 434, a criminal statute, prohibited a government officer or agent from transacting business with any entity in which he/she has any pecuniary interest. The Court found that the obvious purpose of the statute was "to insure honesty in the Government's business dealings by preventing federal agents who have interests adverse to those of the Government from advancing their own interest at the expense of the public welfare." *Id.* at 548, 81 S.Ct. at 308. The Court also considered the fact that the statute did not require a showing of corruption or loss as an element of the crime. As the Court stated:

> This omission indicates that the statute establishes an objective standard of conduct, and that whenever a government agent fails to act in accordance with that standard, he is guilty of violating the statute, *regardless of whether there is positive corruption. The statute is thus directed* not only at dishonor, but also *at conduct that tempts dishonor.* This broad proscription embodies a recognition of the fact that an impairment of impartial judgment can occur in even the most well-meaning men when their personal economic interests are affected by the business they transact on behalf of the Government. To this extent, therefore, *the statute is more concerned*

*with what might have happened in a given situation than with what actually happened. It attempts to prevent honest government agents from succumbing to temptation by making it illegal for them to enter into relationships which are fraught with temptation. Rankin v. United States, 98 Ct.Cl. 357 [1943].*

*Id.* at 549–50, 81 S.Ct. at 309 (footnote omitted) (emphasis added).

The following quotation indicates that the Supreme Court also based its determination—that corruption or loss need not be proven—upon the surreptitious nature by which the conduct sought to be controlled is generally effectuated:

Although nonenforcement frequently has the effect of punishing one who has broken the law, its primary purpose is to guarantee the integrity of the federal contracting process and to protect the public from the corruption which might lie undetectable beneath the surface of a contract conceived in a tainted transaction.... It is this inherent difficulty in detecting corruption which requires that contracts made in violation of Section 434 be held unenforceable, *even though the party seeking enforcement ostensibly appears entirely innocent.*

*Id.* at 564–65, 81 S.Ct. at 317 (citations omitted) (emphasis added). Most important to the Supreme Court's decision requiring nonenforcement were the public policy considerations which led Congress to enact § 434. It noted that the policy "leaves no room for equitable considerations" and any narrowing of this policy is for Congress and not the courts. *Id.* at 565–66, 81 S.Ct. at 317.

Additionally, the Supreme Court underscored the following points: The statute was designed to prohibit government officials from engaging in conduct inimical to the public's interest (*id.* at 548, 81 S.Ct. at 308); Congress intended to establish a rigid rule of conduct (*id.* at 551, 81 S.Ct. at 310); the statute is preventive in nature (*id.* at 559, 81 S.Ct. at 314); the issue is not whether the government employee is certain to benefit from the violation, but whether there is a likelihood that he would be tempted to do that which the statute seeks to prevent (*id.* at 560, 81 S.Ct. at 314); the statute was designed to protect the government from mistakes and the connivance of its agents (*id.* at 561, 81 S.Ct. at 315); Congress sought to adopt a statute whose breadth would be sufficient to cope with the evil (*id.* at 562, 81 S.Ct. at 315); because if the remedy is solely prosecution (or a fine) against the agent, then the public will be forced to bear the burden of a violation (*id.* at 563, 81 S.Ct. at 316).

After concluding that the statute had in fact been violated, the Supreme Court in *Mississippi Valley* next considered the harshness of nonenforcement, given the fact that no corruption or loss had been shown, by stating the following:

Although nonenforcement may seem harsh in a given case, we think that it is required in order to extend to the public the full protection which Congress decreed by enacting Section 434.

*Id.* at 566, 81 S.Ct. at 317 (footnote omitted).

We find that the foregoing principles set forth by the Supreme Court apply equally herein. Like 18 U.S.C. § 434, § 7216 is also a conflict of interest statute intended to protect the public. During debate on the House floor over the Department of Energy Organization Act, Congressman Harris conveyed the purpose of this conflict of interest provision when he stated:

The public expects and we must demand our top energy policymaking officials to put the public's interest first—not their own private interests, not regional interests, not the oil companies [sic] interests.

123 Cong.Rec. 17,279 (June 2, 1977). Congressman Hughes echoed the concerns of Congressman Harris, focusing primarily on the proverbial "revolving door" between employment with the government and that of private industry:

In terms of sheer numbers of individuals moving in and out of Government regulatory agencies from and to regulated industries, there is cause for concern....

Although this problem exists throughout all Government regulatory agencies, those that deal with energy questions must be of greatest concern to us. *There are tremendous stakes riding on the outcome of many government regulatory decisions in the area of energy, and we must take every precaution to assure that the integrity of the process is above reproach.*

We must be certain that, when our regulatory officials make decisions, they have the public interest in mind, and not the prospect of some high-paying job with industry later on.

123 Cong.Rec. 17,409 (1977) (emphasis added). Finally, in the hearings before the House Subcommittee, Congressman Udall expressed concern and admonished Congress to take appropriate steps "so that the 'revolving door' will not reappear in this Department [DOE], as it did in the FEA [Federal Energy Administration]." *Department of Energy Organization Act: Hearings on H.R. 4263 Before the Subcomm. of House Comm. on Government Operations,* 95th Cong., 1st Sess. 158 (1977). Indeed, the final Conference Report accompanying the Department of Energy Organization Act contained the following passage regarding the conflict of interest provisions:

The conferees merged the divestiture and disclosure provisions in order to provide *maximum* assurance that any *potential* conflict of interest arising out of a former, present, or future relationship between a Department employee and any energy concern be eliminated.

S.Conf.Rep. No. 367, 95th Cong., 1st Sess. 86, U.S.Code Cong. & Admin.News 1977, p. 854 (1977) (emphasis added).

 Clearly then, against this backdrop, the legislative intent behind 42 U.S.C. § 7216 of protecting the public's interest—and concomitantly protecting the integrity of the federal procurement process—parallels that behind 18 U.S.C. § 434. For this reason, the court finds that the legal principles expounded by the Supreme Court in *Mississippi Valley* equally apply here. That is to say, where there occurs within the federal procurement process a violation of a conflict of interest statute, which exists for the purpose of protecting the very integrity of that process, any contract arising from such tainted process must be disaffirmed.

The court finds this to be so, despite the fact that in *Mississippi Valley* it was the government, not an unsuccessful bidder, that attempted to disaffirm the contract. Quite simply, the policy considerations upon which *Mississippi Valley* is grounded are all present herein. To find that the interest of the public, the rights of the competing bidders, and the integrity of the federal procurement process can be ignored simply because DOE chooses, in this instance, to do so would be senseless and self-defeating. Equally probative is the fact that the Court of Appeals for the Second Circuit reached this conclusion as well, by extending the holding of *Mississippi Valley* to the context of a private action. *Quinn v. Gulf & Western Corp.,* 644 F.2d 89, 94 (2d Cir.1981).

### 2. *Probative Evidence of Prejudice Exists*

Though the court agrees with the plaintiff that under the facts here and the authority of *Mississippi Valley,* 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268, a showing of prejudice is unnecessary, we nevertheless address its alternative argument that demonstrable prejudice to TESS was proven.

Generally, the requirement of proving prejudice prevents an unsuccessful bidder from overturning a contract award due to a harmless violation of a statute or regulation on the part of the government. In other words, although the plaintiff's ultimate burden is to prove that the government breached its implied contractual duty to treat all bids fairly, the violative act must be sufficiently egregious as to adversely affect plaintiff's chances of receiving the award. This is not to say that plaintiff must show that it would have received an award *but for* the violation. For example, the Federal Circuit stated in *CACI, Inc.–Federal v. United States,* 719 F.2d 1567 (Fed.Cir.1983) that:

The Court of Claims has rejected ... [the] argument ... that a disappointed bidder "must show that, but for the failure to consider its proposal, it would have received a contract." *Morgan Business Associates v. United States,* [223 Ct.Cl. 325, 331] 619 F.2d 892, 895 (Ct.Cl.1980). [In fact] the Court of Claims there indicated, "it would be virtually impossible for the plaintiff to make a 'but for' showing." [223 Ct.Cl. at 332 n. 6] 619 F.2d at 896. It held that the disappointed bidder need demonstrate only that if its bid had been fairly and honestly considered, "there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration." *Id.* This "principle of liability" both "vindicates the bidder's interest and right in having his bid considered" and "at the same time forestall[s] a windfall recovery for a bidder who was not in reality damaged."

*Id.* at 1574–75. This requirement of prejudice also serves the admonition of the Court of Claims in *Keco Industries* that not every irregularity in the procurement entitles an unsuccessful bidder to an award. *See CACI Field Services,* 854 F.2d at 466 (citing *Keco,* 203 Ct.Cl. at 573, 492 F.2d at 1203).

The premise of plaintiff herein is that having shown that Mr. Rousso violated a conflict of interest statute in participating in the SEDM procurement, under circumstances wherein its bid admittedly was in the competitive range, plaintiff need only show that Mr. Rousso's participation—the act which constituted a violation of 42 U.S.C. § 7216—adversely affected its chances of award. Against this background, we consider plaintiff's argument that it was prejudiced.

In this case, plaintiff, aside from its assertions regarding conflicts of interest, has listed a myriad of accusations against the SEB and DOE in support of its argument that the selection of Bechtel's proposal was arbitrary and capricious. Plaintiff now sweeps all of these arguments under the umbrella of the prejudice element. While the vast number of these allegations are meritless given the court's limited scope of review, those relating to the conduct of the SEB, namely Mr. Rousso, are most troubling to the court.

To begin with, one must realize that Mr. Rousso held perhaps the most (or certainly *one* of the most) influential positions at OCRWM regarding the SEDM procurement. He appointed several advisors to the SEB (DX 3, p. 15), helped write both the SOW and the RFP, and chaired the meetings of the SEB and the Preliminary Planning Session—formulating the agenda for each (Tr. 2385). According to Mark Frei, a member of the SEB, Mr. Rousso "kept us on course as we walked through the various subjects that were the topic for that particular Board meeting" (Tr. 2385). Mr. Rousso also commented on the relative strengths and weaknesses of each proposal and tried to build a consensus among the voting members (Tr. 3887–88). In short, the totality of the evidence warrants an inference that Mr. Rousso had an influence on the SEB's decision.

The following is a portion of the direct examination of Mr. Rousso by counsel for the government, which was followed immediately by the cross-examination by plaintiff's counsel:

Counsel for the government:

Q. Which proposal did you recommend to [the Source Selection Official (SSO) ] as the best proposal of the three?

A. I presented to [the SSO] the evaluations of the board of all three proposals, and it was clear that the Bechtel proposal was the only one ranked as Good. The other two proposals being ranked as Satisfactory, it was clearly one level above the other two.

Q. Did you disagree with the conclusion of the Board as a whole?

A. No. I was in total agreement with the Board position.

Q. Was your agreement with the Board position a result of your prior affiliation with SAIC?

A. Not at all.

Q. ... Why did you agree with the Board's position that the Bechtel proposal was better?

A. Simply on the basis of my evaluation, and going through the proposals and the relative merits of each.

Q. Thank you.... I have nothing further.

Cross-examination by plaintiff's counsel:

Q. I think Mr. Kromberg was being too kind. You just didn't agree with the Board's proposal; you helped formulate the evaluation of Bechtel, didn't you?

A. I was one of the seven voting members, *yes*.

(Tr. 200–01; emphasis added).

■ Whether Mr. Rousso's evaluation of the proposals was actually made in good faith is not an issue the court need here address. Although Mr. Rousso may be entirely innocent of any bad faith, and even assuming that any qualified individual in Mr. Rousso's place would have reached the same conclusion and acted in the same manner, such circumstance would not help the court escape the conclusion that Mr. Rousso's participation in the SEDM procurement, in violation of 42 U.S.C. § 7216, had an adverse effect on plaintiff's chances of being selected for the current award. This finding satisfies plaintiff's burden of establishing "prejudice."

In addition to the foregoing, several remaining aspects of Mr. Rousso's conduct also concern the court. When Mr. Rousso called for votes on particular categories of the subject proposal as SEB Chairman, a voting procedure followed whereby the SEB Secretary would distribute little blank slips of paper to each SEB member when a vote was called (Tr. 3843–44). Each member would then enter an initial on his slip of paper to represent a particular adjectival rating with an "O" for outstanding; "G" for good; "S" for satisfactory; "P" for poor; and "U" for unsatisfactory. These slips were then handed to Mr. Rousso, who would proceed to tally the votes (Tr. 3844–45). Sometimes Mr. Rousso would read the votes from each slip of paper in a low tone of voice, while at other times he would count them silently to himself and simply announce the results (Tr. 3845). Curiously, these slips of paper were then discarded and, as far as anyone knows, were never

seen by anyone other than the individual voter and Mr. Rousso (Tr. 3846). One can readily see that such a procedure does little to assure the offeror that its bid was treated fairly. This is particularly true where, as here, the record discloses that the results were not subject to verification. Perhaps this is why *Mississippi Valley* teaches that where a conflict of interest statute is violated, there is no necessity for an affirmative showing of corruption. Corruption in this sense would be virtually undetectable. *See Mississippi Valley Generating Co.,* 364 U.S. at 565, 81 S.Ct. at 317; *see also Morgan Business Associates v. United States,* 223 Ct.Cl. at 331, 619 F.2d at 895.

Our careful review of binding precedent compels us to find that plaintiff, having established that 42 U.S.C. § 7216 was violated by the requisite quantum of evidence, need not also show that it was prejudiced by such violation. Nevertheless, proceeding upon the government's hypothesis that a showing of prejudice is required for plaintiff to prevail, we find that because plaintiff's chances of receiving the award were adversely affected by Mr. Rousso's violation of § 7216, a showing of prejudice was made. Premised on the above, we find that plaintiff has succeeded on the merits based on a violation of a conflict of interest statute. Given the foregoing, we will next summarily address the myriad of other issues raised by plaintiff.

### III. *Other Issues*

As the court has explained, *supra,* the "arbitrary and capricious" standard is a narrow one. *Bowman Transportation v. Arkansas Best Freight System,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). Thus, a court should not substitute its judgment for that of an agency, especially in technical matters in which the judge lacks expertise. *Electro–Methods, Inc.,* 7 Cl.Ct. at 762; *see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

■ Yet, much of DOE's alleged conduct that plaintiff claims to have been arbi-

trary and capricious is squarely a matter of judgment. To accept plaintiff's argument would be to blatantly substitute the court's judgment for that of DOE. For example, the following issues asserted by plaintiff fall under this category:

DOE had no rational basis in—

A. concluding that geoscience, licensing, and nuclear experience are related to the work described in the SOW;

B. failing to regard systems engineering as a much needed discipline;

C. looking at only 10 example contracts provided by offerors for teaming experience;

D. downgrading a proposal for an individual's deficiencies despite the fact that that person was supervised by one without the same deficiencies;

E. concluding that Bechtel had a higher corporate commitment than TESS when the proposed president of BSMI (which had not yet been incorporated) is a vice-president of Bechtel and two of the BSMI board members spend less than 10% of their time at BSMI;

F. ascertaining the number of the 10 example contracts to be considered in order to determine which team had more experience on large federal projects;

G. looking more favorably towards previous experience in "nuclear contracts";

H. failing to consider the 10 example contracts for other technical areas of expertise besides nuclear experience;

I. failing to consider nuclear experience of subcontractors, but only of prime contractors, in determining "corporate experience";

J. concluding that TESS's 10 example contracts were not directly relevant;

K. favoring co-location of facilities rather than decentralized locations;

L. failing to define the term "significant weakness";

M. implementing an adjectival rating system where a one-vote difference could change a rating and a six-vote difference might not;

N. failing to actually cast votes, as opposed to agreeing on ratings for key lead managers, key managers, and selected lower level personnel;

O. considering one offeror's proposal in its entirety before evaluating the next;

P. failing to have a uniform procedure for deciding tie votes;

Q. assembling a SEB consisting of members without prior SEB experience;

R. selecting the Deputy Assistant Secretary of DOE to serve as the SSO;

S. finding that TESS's proposed key lead managers lacked experience in nuclear waste systems and nuclear licensing;

T. finding that a "significant weakness" in the proposal existed in instances where a proposed supervisor was earning less salary than a subordinate;

U. rating Bechtel's cost and schedule control system higher than that of TESS given the fact that the RFP required a cost and schedule control system that *can be* "validated" and Bechtel's had not actually been "validated";

V. finding that TESS's proposed additional technical controls were redundant and constituted a "significant weakness";

W. failing to list in the SEB report all of TRW's strengths; and

X. stating in the SEB report that TESS's corporate commitment was weak when the SEB secretary did not record the same in his handwritten notes.

The court, after a careful review of the facts and applicable law, finds all of these contentions to be totally without merit.

With respect to the standard for determining whether the government's treatment of another offeror's bid was arbitrary and capricious, case law indicates that the question is, in effect, whether there was bad faith or fraud. *See Vulcan Engineering Co. v. United States*, 16 Cl.Ct. 84, 90 (1988) (citing *Keco Industries, Inc.*, 203 Ct.Cl. at 574–77, 492 F.2d at 1203–05). In this connection, plaintiff has also made several contentions regarding DOE's alleged favorable treatment of Bechtel's proposal which fall short of establishing bad faith or fraud on the part of the government. Ac-

cordingly, with respect to those issues, the court hereby dismisses each of the allegations:

A. The SEB irrationally ignored the requirement in paragraph L.049 of the RFP by not downgrading Bechtel's proposal for failure to have a separately dedicated organization;

B. The SEB's failure to consider organizational conflicts of interest presented by Bechtel's proposal was arbitrary and capricious;

C. The SEB acted arbitrarily by not finding Bechtel's lack of geoscience experience to be a significant weakness; and

D. It was a violation of law and, therefore, arbitrary and capricious for DOE not to refer Bechtel's bid to the Attorney General for possible antitrust violations.

Next, as the court has made clear, not every violation of a regulation gives rise to a cause of action for the unsuccessful bidder. *See CACI Field Services, Inc. v. United States*, 854 F.2d at 466; *Keco Industries, Inc.*, 203 Ct.Cl. at 574, 492 F.2d at 1203. Some of plaintiff's contentions also rest upon alleged technical violations which simply do not go to the integrity of the bid selection process. Plaintiff simply cannot show by the requisite quantum of proof that such alleged violations caused its bid to be treated less than fairly. The following contentions fall under this category:

A. The SSO did not make a foreign ownership control and influence (FOCI) determination as required by paragraph L.039 of the RFP; and

B. The SSO violated 48 C.F.R. § 909.570–9(a) by failing to find, as specifically required, whether there were OCIs or no likelihood of OCIs.

Lastly, the court will briefly address the plaintiff's allegations of statutory and con-

tractual violations by Stephen Kale and Gordon Appel.

A. Stephen Kale: Plaintiff alleges that Mr. Kale violated 18 U.S.C. § 208 [13] in that while serving on the SEB as a non-voting *ex officio* member, he held a vested pension in Westinghouse, a Bechtel team member. The plaintiff, however, has failed to show that this pension amounts to a substantial financial interest, *as contemplated by § 208*. The court cannot find on this record that Mr. Kale's vested pension from Westinghouse constitutes such a "financial interest."

In this connection, we agree with Judge Oberdorfer's opinion in *United States v. Conlon*, 481 F.Supp. 654 (D.C.Cir.1979), wherein he stated the following:

Although section 208(a) prohibits a government employee from participating substantially in a matter in which he has any "financial interest," section 208(b) makes clear that *insubstantial interests are to be exempted....*

*Id.* at 667 (emphasis added).

B. Gordon Appel: Plaintiff also claims that Mr. Appel violated an RFP provision when he listed his former supervisor at Dames & Moore as a reference on his SF–171 application while serving as a SEB voting member. This was an alleged violation because Dames & Moore was also a Bechtel team member. The provision in question incorporates DOE's Acquisition Regulations Handbook (PX 29), which states that no SEB members will be in a conflict of interest. The court cannot find that the mere listing of the name of a former supervisor—a typically appropriate choice for a reference—rises to the level of a conflict of interest.

Accordingly, the court finds that none of plaintiff's contentions listed in this section have been proven, and they are therefore

---

**13.** 18 U.S.C. § 208(a) states, in pertinent parts, as follows:

Except as permitted by subsection (b) hereof, whoever, being an ... employee of the executive branch of the United States Government ... participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, inves-

tigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he ... has any arrangement concerning prospective employment, has a financial interest....

categorically dismissed. Although each and every sub-issue listed in plaintiff's post-trial submission has not been separately discussed by the court, they are implicitly subsumed within the issues stated above. As to any other alleged violations, we find that plaintiff has failed to carry its burden by clear and convincing evidence. Now that the substantive issues on the merits have been resolved, our final focus will address the elements required for a permanent injunction to determine whether a grant of such extraordinary equitable relief is warranted.

## IV. *The Propriety of Injunctive Relief*

Before we may grant permanent injunctive relief, this court must consider, in addition to a finding that plaintiff has succeeded on the merits, (i) whether an injunction is within the public's interest; (ii) whether the plaintiff will suffer irreparable harm, including an inadequate remedy at law if the injunction is not granted; and (iii) the extent of injury to the defendant if the injunction is granted (or where the balance of hardships lies). Furthermore, on a motion for permanent injunction, as distinguished from a motion for a temporary or preliminary injunction, the considerations must be viewed more strictly given the variances in the ultimate results. *See Drexel Heritage Furnishings v. United States*, 7 Cl.Ct. 134, 143 (1984).

### A. Public Interest

Turning first to the public interest criterion, the court observes that the defendants assert that the plaintiff cannot prove that the public interest will be advanced, by the grant of injunctive relief, for any reason except that such interest will be furthered by enforcement of the law. Defendants argue that such reasoning by plaintiff does not warrant permanent injunctive relief, except for the private pecuniary interest of TESS because delaying the SEDM procurement will serve no interest, public or otherwise. According to the defendant, the public interest in enforcing the law cannot constitute a satisfaction of this element. This is so because, in every case in which a law is violated, this interest is

present, and the court, by allowing a plaintiff to state this ground as a basis, would in effect render the public interest element a nonentity. The court rejects this circular argument.

On the facts here, in determining whether an injunction is in the public interest, the court needs only to consider 42 U.S.C. § 7216 and the underlying legislative history. This statute relates to federal procurement pursuant to which Congress, in enacting the same, envisioned a specific public policy purpose. More specifically, § 7216 serves to prevent fraud from occurring within an energy-related procurement. These concerns are well within Congress's contemplation as well as the public interest. They are best served by "a rigid rule of conduct" in enforcing this statute. *Mississippi Valley*, 364 U.S. at 551, 81 S.Ct. at 310. Stated succinctly, the Supreme Court indicated that such conflict of interest statutes "were designed to prohibit government officials from engaging in conduct that might be inimical to the best interests of the general public." *Id.* at 548, 81 S.Ct. at 308.

Given the admonishment by the Supreme Court therein and the crystal clear legislative purpose of § 7216, *supra*, this court will not sit idly by and blink at such transgressions on the part of government officials acting under the misguided assumption that such conduct does not harm the public's faith in the integrity of the procurement process. We, therefore, find that this element has been duly established by the requisite proof. The Supreme Court said it best in *Mississippi Valley* that:

> ... a contract is not to be enforced when it arises out of circumstances that would lead enforcement to offend the essential purpose of the enactment.... Therefore, the inquiry must be whether the sanction of nonenforcement is consistent with and essential to effectuating the public policy embodied in [the conflict of interest statute].

*Id.* at 563, 81 S.Ct. at 316 (citation omitted).

### B. Irreparable Harm (Inadequate Remedy at Law)

The next element for consideration is the degree of harm to the plaintiff if the

injunction does *not* issue. As stated, this cost-plus-award-fee contract contemplates an amount in excess of one billion dollars over the next 10 years—$100 million per year with options to renew. While the defendants are perfectly correct in their argument that anticipatory profits are not recoverable in a bid protest action, it is on the other hand perfectly erroneous to conclude from this that the loss of an opportunity to earn an award-fee profit of the magnitude contemplated by this contract is not an irreparable harm that plaintiff will suffer if injunctive relief is denied. *See Quality Transport Services*, 12 Cl.Ct. 276, 282 (1987) (citing *Essex Electro Engineers, Inc. v. U.S.*, 3 Cl.Ct. 277, 287 (1983)). Moreover, an action at law for lost profits will not avail plaintiff because there it could only recoup bid preparation costs in a suit for damages. Thus, it is clear that its remedy at law is inadequate. The court is satisfied, therefore, that plaintiff has shown that it will be irreparably harmed and has an inadequate remedy at law should the injunction not issue.

C. Relative Harm to the Defendants (Balance of Hardships)

Lastly, the court considers the relative harm to the defendants should the injunction issue. First, one must understand that the SEDM contract is not for the construction of the repository, but rather it is for the integration of construction work presently being performed at the Yucca Mountain site. According to the defendants, OCRWM's inability to integrate the contracts is preventing the work from proceeding as expeditiously as possible. The government then goes on to argue that OCRWM is spending $800,000 per day on the program, while Bechtel avers that its delay costs are approximately $11,000–$12,000 per day (Tr. I 1050).

The court cannot find, however, from the testimony proffered, that a delay in the SEDM award resulting from an injunction would necessarily cause a delay in the completion of the repository. Mr. Ronald Milner, Director of Program Controlled Division at DOE, was called as a witness by the government to establish the alleged harm that would inure to the government should the defendants be enjoined. Mr. Milner is responsible for budget formulation and estimating costs under the program. On direct examination, he testified that if the injunction were granted, the daily cost for each day's delay to the government would range from $600,000 to $800,000 per day. Additionally, and without any basis in fact other than a naked guess, he estimated that 90% of said costs would not further the program at the Yucca Mountain site.

A reading of the testimony of Mr. Milner leaves the court with the unmistakable conclusion that it is unbridled speculation, totally void of any supportable factual basis. It is indisputable that—the $600,000 to $800,000 daily costs referenced by Mr. Milner are costs relating to on-going work presently under contract to 50 contractors at Yucca Mountain relating to site characterization. These costs have nothing to do with the SEDM contract, and they will continue next year whether or not there is a six or 12-month delay resulting from the grant of plaintiff's motion; and he testified that the OCRWM employees will be engaged in productive work benefiting the program (Tr. 4564).

Moreover, Mr. Milner testified that—the work to be performed by the 1,445 employees of the existing contractors during any possible delay will be integrated into the license application (Tr. 4580–82); to the extent such work is productive, "[t]here would be no cost … delay" (Tr. 4585); if there is a delay in the SEDM, he does not know at what point the existing (Yucca Mountain) contractors would "not proceed further" (Tr. 4586); he does not even know what contractors are performing work at the Yucca Mountain site, nor the specifics of their contracts (Tr. 4588); and, admittedly, he has not read the SEDM RFP (Tr. 4546–47), nor has he read any of the existing 50 contracts in operation at the Yucca Mountain site or the SOW (Tr. 4589 and 4591). Having conceded the foregoing, Mr. Milner further admitted that—because he does not know what the 1,445 employees of contractors at Yucca Mountain are required to do, then—"I don't know precisely what portion [of their work] would not further the [SEDM] program" if there is a

delay due to the grant of a permanent injunction (Tr. 4591). Finally, he acknowledged that said 1,445 employees will be performing their field work under existing DOE contracts next year, whether or not the SEDM contract is awarded, and such data will help DOE assess whether the Yucca Mountain site is an appropriate site for the repository (Tr. 4593). When asked if any contractors at Yucca Mountain are *not* performing work because of the existing preliminary injunction, Mr. Milner stated—"not that I'm aware of" (Tr. 4598).

The record shows that there are critical circumstances causing delays at the Yucca Mountain site that are more vexing than the present injunction or a prospective permanent injunction. In this connection, Mr. Milner conceded that—certain permits (such as air and water) are required from the State of Nevada, the non-receipt of which has impeded construction progress. Also, Mr. Milner did not know what those *other* permits are or what they relate to (Tr. 4654–59), nor has he observed any employee of either OCRWM or contractors at the Yucca Mountain site doing work since March 9, 1989, that has not advanced the program (Tr. 4663–69). Moreover, there have been more than 50 lawsuits filed with respect to the waste program (Tr. 4670), and Mr. Milner testified that he has not considered the impact of these lawsuits on the nuclear waste program (Tr. 4672). In fact, OCRWM will not even know with certainty whether or not the Yucca Mountain site is suitable to house the repository until 1993. If the Yucca Mountain site is found unsuitable, DOE is required to report to Congress with its recommendations as to what would next be done to resolve the nation's nuclear waste problem (Tr. I 570–72, 593). Against this setting, to conclude that a permanent injunction will be the primary cause for delay in the completion of the repository is speculative to say the least.

It is therefore the finding of this court, in view of the foregoing, that the public interest is best served by the grant of a permanent injunction, that the denial of a permanent injunction will visit immediate irreparable harm to the plaintiff, that plaintiff's remedy at law is inadequate, and that the balance of hardships tips in favor of the plaintiff.

*Conclusion*

Wherefore, consistent with the above, plaintiff's motion for a permanent injunction is hereby GRANTED as follows:

(i) the defendant, the United States Department of Energy, its officers, agents, servants, employees, and representatives, and all persons acting in concert and participating with them respecting subject procurement, be and they are hereby PERMANENTLY RESTRAINED AND ENJOINED from awarding a contract and disbursing funds under RFP No. DE–RP01–88RW00134 to anyone other than the plaintiff herein; and

(ii) intervenor, Bechtel National, Inc., its subsidiaries, agents, and assigns be and they are hereby PERMANENTLY RESTRAINED AND ENJOINED from executing, receiving, and performing on any contract, and from receiving any funds disbursed by the United States, the Department of Energy, or any other government agency under RFP No. DE–RP01–88RW00134.

With respect to the prayers in paragraphs # 2 through # 4 of plaintiff's complaint, we have carefully considered same, and they are hereby DENIED.

No costs shall be awarded.

IT IS SO ORDERED.

